**Duane Earl POPE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 18272.

United States Court of Appeals Eighth Circuit.

Feb. 13, 1967.

Rehearing Denied March 14, 1967.

---

See also D.C., 251 F.Supp. 234.

Wallace M. Rudolph and Robert B. Crosby, Lincoln, Neb., for appellant.

Theodore L. Richling, U. S. Atty., Omaha, Neb., for appellee.

Before VOGEL, Chief Judge, and VAN OOSTERHOUT, MATTHES, BLACKMUN, MEHAFFY, GIBSON, and LAY, Circuit Judges, sitting en banc.

BLACKMUN, Circuit Judge.

The defense on this appeal concedes that shortly before noon Friday, June 4, 1965, Duane Earl Pope, when armed with a gun, robbed the Farmers State Bank at Big Springs, Nebraska, a federally insured institution, of $1,598, and, in the course of that robbery, shot and killed three employees of the bank and seriously wounded a fourth.

A 6-count indictment was returned on June 22 charging Pope with violations of the bank robbery statute, 18 U.S.C. § 2113(a), (b), (d), and (e). He entered a plea of not guilty. The trial consumed most of the month of November 1965. After deliberating for two days the jury convicted Pope on all six counts. The verdict on the last three counts, which charged the killing of the respective bank employees, directed, as § 2113(e) permits, that the defendant be punished by death. Judge Van Pelt imposed concurrent sentences of 20, 10 and 25 years, respectively, on the first three counts, and a sentence of death on each of the last three counts. This court stayed execution of the death sentences pending appeal.

*The evidence.* There is no conflict as to the basic facts. Many of them were conceded by the defense's Judicial Admission filed just prior to trial.

Duane, at the time of the offense, was 22 years of age. He had graduated the preceding Sunday from McPherson College, a denominational school at McPherson, Kansas. He was one of eight children born of farm parents. He attended elementary and high school in Roxbury. He led the normal life of a farm boy. He was an ordinary student and perhaps less of a disciplinary problem than the average boy. He was very active in both the athletic and extracurricular programs of his high school. He engaged in football and basketball for four years and in track and baseball

for three. He participated in band, glee club, chorus and dramatics. He was president of his senior class. He was a member of the student council for two years. He was captain of the basketball team and co-captain of the football team his senior year.

Duane was encouraged by the high school faculty to go to college. He enrolled at nearby McPherson. He received student loan assistance there and participated in a work program. At college he was an average student and a fine athlete. He was placed on scholastic probation at times but was able to emerge from it. In his last year he was co-captain of the football team and was named all-conference defensive end by members of opposing teams.

There is evidence to the effect that at his father's work shop and at the college laboratory he worked on silencers for guns; that he designed and constructed at least two of these devices; that on May 15, 1965, he purchased a revolver to which he affixed one of the silencers; that he tested it in his father's barn and found it not to be effective; that on May 27, with a down payment he purchased a .22 Ruger automatic pistol; that he welded a coupling to this gun so that a silencer could be attached to it; that he described this coupling as something else to his father and an instructor; and that he made a breast plate out of a tractor blade.

On Wednesday, June 2, following his graduation, Duane was at home. His parents were there. He went upstairs and dropped a rifle out the window and then went outside, picked it up, and put it in his 1939 Buick. He had already placed the Ruger and the silencer in the automobile. He borrowed $50 from his father, told his parents that he was going to Oklahoma to look for work, and departed. He drove north some 30 miles to Salina, Kansas, where he registered in his own name at a motel. The next morning he rented a 1965 Chevrolet from the Hertz Agency and eventually drove it to Ogallala, Nebraska, where he registered in his own name at a motel. That evening, after dark, he drove the few miles to Big Springs, rode around the bank there, and returned.

He arose early the next morning, placed the gun in his brief case, and drove as far as Brule on the way to Big Springs. There he turned off the highway and checked a back road south of Brule which he used after the robbery. While on this road he removed the automobile's license plates.

Duane then drove to Big Springs, and went by the Farmers State Bank. He passed it slowly a second time, noticing that customers were there. He approached it again shortly after eleven a. m. This time only employees were inside. He parked by the bank, took his brief case containing the Ruger and the affixed silencer, and entered. He inquired of Andreas Kjeldgaard, the president, about a land development loan. Mr. Kjeldgaard told him that the bank did not make a loan of that kind but went to get a telephone book to find the number of another area bank which might make the loan. Duane came around the end of the counter into the employees' area, drew out the gun, and told Mr. Kjeldgaard to put the bank's money in the brief case. Employee Franklin Kjeldgaard, the 25-year-old nephew of the president, came to assist his uncle. They removed the money from the cash drawer under the counter and put it in the brief case. Duane then ordered employee Lois Ann Hothan to get money out of the vault. She entered the vault, brought out some one dollar bills, and placed them in the brief case. A fourth employee, Glen Hendrickson, was sitting at a table while all this was happening.

Duane then ordered all four persons to lie on the floor face down. All complied. He shot the elder Kjeldgaard in the back and at the rear of the head. The gun jammed. He unjammed it and then shot each of the other three in the back and again in the neck or head. Franklin Kjeldgaard did not lose consciousness. He was able to see and hear what took place. The other three died at the scene.

After Duane left the building, Franklin was able to sound a burglar alarm. Franklin survived and testified at the trial.

When he left the bank Pope drove to the main highway and then took the back road running south of Brule. He traveled southeast at high speed. He unscrewed the silencer from the Ruger and threw it out the window of the car. Farther on, he stopped the car, got out, and threw the gun into a field. He continued traveling fast, hit a bump and punctured his gas tank. He purchased gas at Wauneta and attempted to plug the hole with a rag. The station attendant refused to accept his expired credit card or his check and Pope drove off after giving a false address. He later purchased gas for cash and put the license plate back on the car. He eventually reached Salina and registered at the same motel in his own name. He obtained his 1939 Buick. He went to bed but at two a. m. he got up, returned the rented automobile to Hertz, and then drove his own Buick to his parents' home. He did not go into the house but left $150, together with a note, in the mail box. The note advised his father that he was returning the $50 he had borrowed and asked that he deposit the other $100 in the defendant's bank account.

He went on to Wichita where he abandoned the Buick. He bought a bus ticket to Enid, Oklahoma, and then proceeded by bus to Oklahoma City, by plane to El Paso, and by bus to San Diego where he arrived June 6. He placed money and and another gun he was carrying in a storage locker and went to Tiajuana, Mexico. He attended a bull fight. He returned to San Diego and checked into a hotel under a false name. On June 7 he bought a used car under another name. While purchasing the car he saw a newspaper and read of the Big Springs robbery. His car broke down. He took a bus to Las Vegas where he gambled and amused himself until Thursday night, June 10, when he read in a newspaper a message from the president of McPherson College appealing to him to turn

himself in. He decided to take this advice. On the morning of June 11 he flew to Kansas City, Missouri, and checked into a hotel under a false name. He telephoned the McPherson president and then the Kansas City police.

At the trial teachers, staff and classmates of his high school and his college years and businessmen and employers at Roxbury and McPherson testified that Duane's conduct in their experience was exemplary. His high school superintendent could not recall any problem of discipline or behavior with respect to Duane. His Roxbury employer considered him "the best man I ever hired". His college football coach described him as cooperative and as giving him "the least trouble of anybody that I had". His harvest employer said that he did his work "better than anyone else". His home town banker, from whom he had borrowed money, described his attention to his credit responsibilities. The McPherson buildings and grounds superintendent, under whom Pope had worked during his college years, said he was "the best of any of them".

Except for parking tickets and one minor traffic violation, there is no evidence that Duane Pope had ever been in difficulty with law enforcement authorities.

The defense's seven basic points on appeal concern: (1) two confessions; (2) a court-ordered psychiatric examination; (3) the selection of the jury, and, specifically, (a) the Nebraska selection system, (b) the exclusion of persons with scruples against capital punishment, and (c) the court's refusal to inquire as to political and religious beliefs; (4) the limitation of evidence as to mitigation and rehabilitation; (5) a refused instruction as to the jury's authority not to impose the death penalty; (6) a refused instruction that a finding of not guilty would result in hospitalization until cured; and (7) instructions as to criminal responsibility.

I. The confessions. Two written confessions were taken from Duane Pope at Kansas City and were offered by the prosecution and received in evidence.

The defense claims that the trial court committed prejudicial error in denying its motion to suppress these statements and in admitting them.

An initial word as to the content of the statements is appropriate. It is fair to say, we think, that the great bulk of the confessions' recitals is of no real significance, so far as proof of the case is concerned, for the material was otherwise proved by the prosecution or conceded by the defense's Judicial Admission and is not contested.

The first confession is one of six pages. It contains only narrative matter, such as Pope's driving to Big Springs, the robbery, the shootings, and his disposal of the weapon. None of this is probatively unique in the record.

The second confession is one of nineteen pages and is much more detailed than the first. While it, too, contains a great amount of factual material which is otherwise proved, it does embrace recitals as to purpose and motive. It mentions Pope's making the silencer "to reduce the noise when I fired" the gun. It says that Pope "had been thinking about using this gun in a robbery of the bank at Big Springs, Nebraska". It further states, "My plan was to rob the bank and then kill everyone in the bank so they would not be alive to identify me as the robber". It tells of Pope's arrival at Big Springs late in the afternoon of June 3 after the bank was closed, "so I did not rob the bank that day as I had planned to do". It recites that he shot the four employees "as I had planned to do to be sure they were killed so that they would not be alive to identify me as the bank robber".

It is therefore apparent that, from the defense side, the confessions could be really critical only as to the expressions of planning and of reasons for killing contained in the second statement. All the rest is not contested. And even as to these possibly critical areas, we must bear in mind that Pope took the stand and that defense psychiatrists testified. Pope and these psychiatrists explained directly to the jury what they felt about

motivation. If, as claimed, the written statements contain factual errors as to motive, the defense, through this testimony by Pope himself and by his psychiatrists, possessed the opportunity, and availed itself of it, to explain away these alleged errors. Thus, any trial significance of the statements fades considerably and prompts one to wonder why their introduction was felt necessary or advisable. Nevertheless, we examine the facts as to the taking of the two confessions.

Pope called the Kansas City police from his hotel room in that city in mid-afternoon on Friday, June 11. He said that he understood he was wanted for the robbery at Big Springs and that he wished to give himself up. He gave the name of his hotel and the number of his room. When the police arrived the door to his room was open. The officers entered, found Pope seated, identified themselves, told Pope he was under arrest, and asked him to stand. He did so and "immediately turned around and put his hands up on the wall of the room". He was searched and handcuffed. As the handcuffs were being placed, the officers advised Pope that he did not have to make any statement; that he had a right to counsel; and that if he did say anything it could be used against him. Pope replied, "I know about that stuff". He was then taken to the Kansas City police station to be turned over to the FBI. He was never booked by the police.

Two agents of the FBI came immediately to headquarters. They identified themselves. The defense brief states, "It is agreed that the defendant was warned about the Fifth Amendment and that he had a right to consult a friend or an attorney before making any statement". Special Agent Harman testified that Pope said that he had surrendered because he had read he was wanted for the robbery of the Big Springs bank; that he asked Duane if he understood that three persons had been killed in that robbery; that Pope acknowledged he did; that he asked Pope if he realized that the person responsible for that rob-

bery could be given the death penalty; that Duane said he did; that he was asked whether he was willing to make a statement; and that Pope said he was.

In the room at the time were two FBI agents and two Kansas City detectives. Agent Harman reduced the interview to writing. The room was not locked. During the interview persons opened the door. Pope was offered cigarettes and coffee and his request for water was honored.

Agent Harman testified that when the statement of June 11 was written he showed it to Pope and explained that it was his and not the agent's statement, and that they read it together and out loud. At one time Duane put his face in his hands. One correction was ordered by Pope. He initialed it and each page. He wrote a final paragraph in his own hand reciting, "I have read the above six page statement and it is true to the best of my knowledge and belief", and signed. The statement acknowledges that it was made voluntarily to identified FBI agents; that he had been advised he would not have to make a statement; that any statement could be used against him in court; that he could consult a friend or attorney before making a statement; and that if he could not afford an attorney, one would be provided for him by the court free of cost to him.

Pope was then taken before a United States commissioner who testified that the defendant appeared to be "alert and calm". The commissioner advised Pope that he had a right to a preliminary hearing and to counsel but made no reference to providing counsel free of charge; that he could not be compelled to testify; and that if he did it could be used against him. The charge then pending was only for bank robbery. When the commissioner asked the United States attorney for his recommendation as to a bond, he was told in Pope's presence that three people were killed during the robbery. Bond was set at $100,-000. The matter was continued pending the arrival of a certified copy of the complaint and warrant.

The next day, Saturday, June 12, Harman and another agent again interviewed Pope in the sheriff's office at the county jail. He was advised that he did not have to make any statement; that if he did it could be used against him; and that he could see a friend, relative or attorney before talking to them. This interview was also reduced to writing by Agent Harman. This second statement of June 12 also makes the preliminary recitals about identification of the agents, the possible use against him of any information he gave, the right to consult a friend or an attorney before making a statement, the right to a court-appointed attorney free of charge, and the absence of threats or promises. The robbery, the shootings, the departure from the bank, and the disposal of the silencer and gun are all described. Pope again called for a number of corrections, initialed them, added a closing paragraph, and signed. During this interview the agent went out and brought back a gun which Pope identified. It was also interrupted for Pope and the two agents to have lunch.

We are aware, of course, of the ever tightening standards being promulgated with respect to the use of confessions in a criminal trial. We are particularly aware of the reversal of a conviction in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), where a statement was obtained after general inquiry had ceased and investigation had focused on the particular suspect in custody, and where the suspect was denied access to his existent and available counsel and had not been warned of his right to keep silent. We are also aware of the reversal of convictions in Miranda v. State of Arizona, and in two companion cases, 384 U.S. 436, 467–477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), setting out current requirements for the evidentiary use of confessions. And we are aware of what may be a trend toward the elimination of all written confessions in criminal trials.

■ Duane Pope's trial, however, took place in November 1965; the verdict was

717

returned December 3. The trial thus occurred after *Escobedo* but before *Miranda*. As everyone knows by now, *Escobedo* and *Miranda* are not retrospective in their application. Johnson v. State of New Jersey, 384 U.S. 719, 733–735, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Each applies only to the case where the trial begins after the decision was announced. Accordingly, *Escobedo* is applicable here but *Miranda* is not. We are therefore primarily concerned with deprival of counsel rather than failure to provide it.

It is at once obvious that the Pope facts fall far short of the extreme facts of *Escobedo*. It is true that, as in *Escobedo*, inquiry had focused upon Duane Pope but, in contrast to *Escobedo*, Pope had not been refused an opportunity to consult with counsel and there was no absence of advice as to his right to keep silent.

Pope voluntarily gave himself up in response to his college president's broadcast appeal and telephone conversation. Pope's was not a forced surrender. He traveled from Las Vegas to Kansas City for this purpose and on his own initiative. He called the Kansas City police and advised them of his whereabouts. Second, Pope concedes that upon his being arrested and handcuffed the police advised him of his basic rights. Third, his statement at the time of this arrest demonstrated an awareness of these rights. Fourth, the FBI agents, at the time of his being turned over to them by the Kansas City police, advised Duane of his rights. He acknowledged to them an awareness of the killings during the robbery and that the person responsible could be given the death penalty. Fifth, the United States commissioner, prior to the taking of the second statement, ad-

vised Duane that he need not make a statement, that he had a right to counsel, and that any statement could be used against him. Sixth, Duane was an adult and a college graduate and was not a person of subnormal intelligence. Seventh, there is not the slightest intimation of abuse or undue pressure by the police or the FBI.

The trial court's finding that both confessions were voluntarily given thus has ample support in the record. Indeed, the record contains little, if anything, which would support a finding of involuntariness. Even under *Miranda's* particular "heavy burden" imposed on the government to demonstrate a knowing and intelligent waiver, p. 475 of 384 U.S., 86 S.Ct. 1602, that burden could be said to have been met here.[1] We are readily satisfied, however, that the strict but lesser standards of *Escobedo* and Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), were clearly met.

■ We therefore hold that the record adequately supports the trial court's conclusion that the statements in question were voluntarily given by Duane Pope after he had been properly advised of his rights. Their introduction in evidence at the trial was not error. See Golliher v. United States, 362 F.2d 594, 598–599 (8 Cir. 1966).

II. The court-ordered psychiatric examination of Pope.

When defense counsel were promptly appointed by the federal court in Nebraska they moved for a continuance of the arraignment. This motion was granted and arraignment took place in July. Pope pleaded not guilty to all six counts of the indictment.

On the day of the arraignment the defense moved for the issuance of subpoenas

---

1. "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. * * * There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a

person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Miranda v. State of Arizona, supra, p. 478 of 384 U. S., p. 1630 of 86 S.Ct.

pursuant to Rule 17(b), Fed.R.Crim.P., to two psychiatrists and a psychologist. The defendant's supporting affidavit recited that these witnesses would be expected to testify that the defendant on June 4, 1965, "did not have the capacity to control his behavior and to choose between alternate courses of action". This motion was granted and the subpoenas were issued, with payment of expert witness fees to be made by the United States. The defense of insanity was thus indicated.

On August 27 the government responsively moved the court for an order "permitting psychiatrists and psychologists selected by the plaintiff to conduct examinations of the defendant as to his mental condition at all times material to this action". This motion was opposed by the defense; the court denied it "at present". During the trial, after Pope had taken the stand and the defense had offered expert testimony as to Pope's mental condition, the motion was renewed. When so renewed it was granted. Defense motions that it be furnished a transcript or recording of the government examination were denied. The court recessed over the Thanksgiving weekend to allow time for the examination. After the recess, the government examiners were called as witnesses. One of them, Dr. Groves Blake Smith, testified:

"As this developed on the 27th of May when he got this interest in guns there were periods apparently that he had had and these had been raised during the period that he had been studying criminology as to shooting people. This shooting people, however, was usually associated with the fact that this was a part of robbery, and that the robbery was the means to an end by which a person who committed a robbery would gain financial benefits from it. This was one of the things that I think was the means by which subconsciously he felt that this was the means of getting money that he could not get—borrow from his father, that he could not get from loans, or that he didn't have the ability to do sufficient work to build it up, but he did want to when Melinda came back have the possession of money that would allow him to feel that he could provide for her in the way that he wanted to. Now, this was, I think, a definite mechanism with the fact that he still feels the depth of love for Melinda was the motivating factor for his desire to get money together."

Error is claimed to exist, first, in the court's requiring the defendant to submit to this at all and, second, in the court's refusing permission for a transcript of the examination. The claim on this issue centers primarily in Dr. Smith's quoted testimony.

The defense asserts that no power exists in the court to order the examination; that, as a result, government psychiatrists testified as to Duane's motive for the crime, namely, that "he did it for Melinda", by "relating admissions supposedly made by" the defendant; that this is testimony "in essence that the appellant did the killing because he wanted money for Melinda"; that such inferences should, instead, have been developed in cross-examination of Pope and "not from a star chamber proceeding"; that the Melinda motive was not evident from the FBI testimony or from Pope's; that, contrarily, the whole of the defense case "was based on the fact that there was no ostensible or rational motive for the crime, but only a motive based on an unknowable, unconscious desire to kill"; that even when one is ordered to testify under an immunity statute he does so in court and in the presence of his counsel; that the only analogous procedure is that in Rule 35, Fed.R.Civ.P., which changed pre-existing law and which has no application to criminal cases; that that rule has no counterpart in the Criminal Rules; that even under the 18 U.S.C. § 4244 procedure for determination of competency to stand trial, the statute proscribes the use in evidence of any statement made by the accused in the course of examination; that the motivation statement elicited in the government examination and

the one in the second confession constitute the only evidence which established any rationale for the offense; that "Neither came from the appellant's lips", and "both were suggested by other persons who are authority figures"; and that Pope was compelled to testify "by hearsay at trial through the mouth of a hostile witness".

We note initially that there is no contention here as to the insufficiency of the evidence if the government's psychiatric testimony is admissible. We also note that the defense position that motive is suggested only by the second confession and by Dr. Smith's testimony, may not be completely accurate. The defense's principal contention, of course, is that Pope had absolutely no motive or reason for the robbing and killing. Absence of motive is used by the defense to substantiate its claim that Pope was indeed insane and thus not criminally responsible. The defense suggests that the only explanation for Pope's action is that he was suffering from the schizophrenic reaction indicated by the defense psychiatrist-witnesses.

There is, however, some evidence of motivation in the testimony of others. Kansas City police detective Harlow testified that during the interrogation on June 11 Pope said, "I done it because I was in debt" and that the debt was "around $1300". Police detective Smith testified that among Pope's personal effects there was a photograph which Duane described as that of his fiancee. FBI agent Harman testified that Pope stated that he needed money because of his substantial debts, his desire to go into farming and his desire to get married. On the other hand, the defense introduced evidence that the defendant's total indebtedness was about $900; that Pope was prompt in settling his debts; that the amount of his debts in June 1965 was not unusual for him; and that it was less than his debts had been at other times. The defense contends that these debts were not bothering the defendant; that he had no such pressing need for money as would prompt him to rob a bank; that his only reason for going to the bank was to kill

as the result of a schizophrenic breakdown; and that the robbery was secondary.

In rebuttal the government presented Gerald Johnson, who knew Pope while he worked during the 1964 harvest season in the Big Springs, Nebraska, area. Johnson testified that he had a conversation with Pope and another person while they were sitting on a curb one day in Big Springs; that the conversation was about the details of a bank robbery there six or seven years before when robbers stole about $15000; and that Pope started the conversation by asking if the bank had ever been robbed.

There are, thus, intimations of motive apart from the second confession and Dr. Smith's testimony.

So far as counsel and we have been able to ascertain, there is no federal case precisely in point in this area. We note, however, that in the habeas corpus case of Early v. Tinsley, 286 F.2d 1, 3 (10 Cir. 1960), cert. denied 365 U.S. 830, 81 S.Ct. 717, 5 L.Ed.2d 708, it was held that a pre-arraignment psychiatric examination by a state "did not work a denial of due process or amount to self-incrimination". See, also, Fouquette v. Bernard, 198 F.2d 860, 861 (9 Cir. 1952).

It is true, as the defense suggests, that prior to the adoption of Civil Rule 35 in 1938, a divided Supreme Court held that at common law a federal court possessed no power in a civil case to order a plaintiff to submit to a pre-trial physical examination. Union Pac. R. v. Botsford, 141 U.S. 250, 257, 11 S.Ct. 1000, 35 L.Ed. 734 (1891). The result was otherwise in a diversity case where an authorizing state statute existed. Camden & Suburban Ry. v. Stetson, 177 U.S. 172, 20 S.Ct. 617, 44 L.Ed. 721 (1900). And the federal rule, since it was adopted, has been upheld on a procedural-versus-substantive approach, although only by a 5 to 4 vote, Sibbach v. Wilson & Co., 312 U.S. 1, 61 S.Ct. 422, 89 L.Ed. 479 (1941), and against constitutional attack, Schlagenhauf v. Holder, 379 U.S. 104, 114, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964).

We recognize, too, as the defense also urges, that it has been held that:

1. A defendant's refusal to cooperate with a statutorily authorized psychiatric examination does not disentitle him from asserting a statutorily recognized special plea of not guilty by reason of insanity. French v. District Court, 153 Colo. 10, 384 P.2d 268 (1963).

2. Evidence of a military defendant's refusal to submit to a psychiatric examination is inadmissible. United States v. Kemp, 13 U.S.C.M.A. 89, 32 C.M.R. 89 (1962).

3. Where the state is permitted by court order to have a psychiatric examination made of the defendant, the presence of a defense expert would be in order, and if the presence of defense counsel is not permitted, "consideration may be given to the feasibility of permitting such devices as recording instruments or the like to be utilized at the psychiatric interview". State v. Whitlow, 45 N.J. 3, 210 A.2d 763, 775–776 (1965). See Dziwanoski v. Ocean Carriers Corp., 26 F.R. D. 595 (D.Md.1960), and In re Spencer, 63 Cal.2d 400, 46 Cal.Rptr. 753, 406 P.2d 33, 42 (1965).

4. In the absence of a statute a state court has no power to order a psychiatric examination of the defendant and to do so may be a violation of the Fifth Amendment. State v. Olson, 274 Minn. 225, 143 N.W.2d 69 (1966).

But these authorities, even if we were to accept them at face value, do not provide the answer for the facts of the present appeal. Insanity is the asserted defense here. Pope himself had taken the stand and had testified as to his lack of motivation, his urge to kill, and other aspects of his behavior which conceivably were pertinent to his defense. The defense had also presented the testimony of one of its psychiatrists and its psychologist covering their examination of Duane Pope and their opinion as to his schizophrenic state and his competency at the time of the robbery. Until all this had taken place before the jury, the trial court meticulously refrained from granting the government's request for an independent examination of the defendant. When, however, this defense evidence came forth from the witness stand, the issue of insanity thereby progressed beyond the indicated or suggested stage and was present in full force and as the primary issue of the case. Whether one frames his approach in terms of waiver or of fundamental fairness buttressed with appropriate protective instructions, see State v. Whitlow, supra, we fail to perceive any constitutional violation or prejudicial error in what the trial court did here. Certainly, the criminal trial is still a search for truth subject, of course, to constitutional guaranties. It would be a strange situation, indeed, if, first, the government is to be compelled to afford the defense ample psychiatric service and evidence at government expense and, second, if the government is to have the burden of proof, as it does with the competency issue in the case, Davis v. United States, 160 U.S. 469, 486, 488, 16 S.Ct. 353, 40 L.Ed. 499 (1895), and yet it is to be denied the opportunity to have its own corresponding and verifying examination, a step which perhaps is the most trustworthy means of attempting to meet that burden. Yet that is precisely what the defense claims is appropriate here.

■ While we have recognized that expert medical opinion may not always be an essential on the government side of a competency issue, see Dusky v. United States, 295 F.2d 743, 754–758 (8 Cir., 1961), cert. denied 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536; Kaufman v. United States, 350 F.2d 408, 414 (8 Cir. 1965), cert. denied 383 U.S. 951, 86 S.Ct. 1211, 16 L.Ed.2d 212 it is certainly advisable and to be encouraged as an important factor in the ascertainment of the truth. The New Jersey court phrased it well in State v. Whitlow, supra, p. 770 of 210 A.2d:

"An accused who asserts lack of criminal guilt because of insanity and who fully cooperates with psychiatrists engaged by him for examination purposes, answering all questions put to him including those relating to the

crime itself, ought not to be allowed to frustrate a similar comprehensive examination by the State by asserting the bar against self-incrimination. He ought not to be able to advance the claim and then make the rules for determination of the claim."

Pope did cooperate with the government examiners as well as with his own and did not stand mute or only partially comply.

We also observe in passing that Dr. Smith's testimony here strikes us as not being merely a recital of what Pope said his motive was. There is, thus, no third party hearsay presentation by the doctor of that motive as a fact. Instead, what we have is Dr. Smith's considered opinion, drawn from his examination, as to why Duane did what he did. This is Smith's opinion, not Pope's compelled self-incriminatory concession.

We recognize that the Supreme Court in its recent blood alcohol case, Schmerber v. State of California, 384 U.S. 757, 761, 765, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966), emphasized the distinction between the taking of a blood sample without the subject's consent, under the circumstances there present, and "evidence of a testimonial or communicative nature", and that there were four votes in dissent. But that was a case of non-consent; it did not concern a totally exonerating issue advanced by the defense itself and presented by the testimony of the defendant personally and of his own examining experts.

We therefore specifically hold that by raising the issue of insanity, by submitting to psychiatric and psychologic examination by his own examiners, and by presenting evidence as to mental incompetency from the lips of the defendant and those examiners, the defense raised that issue for all purposes and that the government was appropriately grant-ed leave to have the defendant examined by experts of its choice and to present their opinions in evidence. We further hold that Dr. Smith's testimony was opinion evidence and not hearsay and was properly received.

What we have said applies to the additional and subordinate suggestion by the defense that a transcript of the government's examination should have been made and supplied to it. See State v. Snyder, 180 Neb. 787, 146 N.W.2d 67, 68 (1966); In re Spencer, supra, p. 761 of 46 Cal.Rptr., p. 41 of 406 P.2d; Whitfield v. Superior Court, Cal.App., 54 Cal. Rptr. 505, (Cal.Dist.Ct.App.1966).

III. The selection of the jury. Under attack here, on Sixth Amendment "impartial jury" grounds, are (a) the Nebraska suggester, or key man, system of petit jury selection; (b) the trial court's exclusion upon voir dire of persons having conscientious objections to capital punishment, and (c) the court's refusal upon voir dire to inquire into the political and religious beliefs of the jurors.

A. The suggester system. The immediate answer to this aspect of the defense attack is that one is compelled to conclude that the point was neither timely nor appropriately raised in the trial court. Although there were pre-trial motions to suppress evidence and, as our subsequent discussion indicates, for non-exclusion of persons having scruples about capital punishment, there was no formal challenge to the entire array or anything in the nature of a motion to quash based upon an improper selective process. Trial was set for November 1. The entire day was occupied on voir dire. Only at the very end of the day, after 49 jurors and 4 alternates had been selected, and after the jury was excused for the night, was a general objection orally made.[2] Selection of the last 3 jurors

---

2. "MR. RUDOLPH: We object to the manner of choosing the jury panel in that it does not allow for a proper cross section of the community. The method of choosing by reommendation places undue emphasis on the length of residence, re-sulting in an undue representation of older age groups and a dearth of representation of young persons. This is especially prejudicial in this case as psychiatric evidence will be presented, and the

resumed the next day. No offer of proof as to panel selection was made and no opportunity was afforded the government to refute the contentions now being advanced.

Under these circumstances, the objection came too late and in an improper manner. Frazier v. United States, 335 U.S. 497, 501–503, 69 S.Ct. 201, 93 L.Ed. 187 (1948), is conclusive on this point. We would be fully warranted in holding that the issue is not before us.

Nevertheless, because the issue is strenuously urged on appeal, and because this is a capital case, we comment on the issue before leaving it. With the point not raised below, the record contains nothing about the Nebraska system of petit jury selection. The defense would supply this lack by exhibits attached to its appellate brief. This material consists of: (1) The January 1961 order entered by the two active federal judges for the District of Nebraska providing for the selection of petit jurors for trials at Lincoln from eleven area counties, as prescribed by 28 U.S.C. § 1865(a). (2) The form letter sent by the clerk to suggesters. This letter listed the statutory requirements for jury service prescribed by 28 U.S.C. § 1861, and stated:

"The need is for people, selected without regard to race, color, sex, creed, or politics, who are fair-minded, of good character, and who possess integrity, sound judgment, and a sense of responsibility. This does not mean that only persons of wide public recognition or high estate are wanted. These qualities of good citizenship are found among the unheralded just as often as among the prominent."

(3) A form with spaces for the name, address and occupation of each person proposed. (4) The form letter sent by the Clerk to the prospect requesting completion of an accompanying questionnaire.

(5) The questionnaire itself calling for information as to the stated statutory qualifications, active military service, membership in a voluntary fire or police department, public office held, and prior jury service. This form as now employed, is not dissimilar to the example in the 1960 Report of the Judicial Conference Committee set forth at 26 F.R.D. 409, 507–508. (6) A letter dated April 25, 1966, from the clerk to Mr. Rudolph, defense counsel transmitting these items. This letter recited that the persons listed by the suggesters are not automatically accepted as jurors; that they are only a source of names; that the questionnaires are examined and, if necessary, additional information is obtained; that "no deviation [was] made in the *Pope* case from our usual practice in making selection of jurors"; and that the jurors for the *Pope* case were actually drawn in March 1965, a date prior to the crime. The letter, however, also contains the following sentence:

"In 'Suggesters' we look for persons who themselves are possessed of all the qualifications necessary for excellent service as jurors but who, in addition thereto, enjoy a wider acquaintanceship with persons residing in their respective communities than might be expected of the average citizen."

We note, initially, that no question of race is involved in this point.

In Beatrice Foods Co. v. United States, 312 F.2d 29, 33–37 (8 Cir. 1963), cert. denied 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199, we had occasion to pass upon the Nebraska suggester system so far as it related to the selection of a grand jury. There, however, a specific pretrial and even pre-pleading challenge had been made and evidence as to the system had been introduced. We observed there, as we may properly observe here, that the attack was not based on the ground that any particular person on the jury was not

---

fact that the defendant is a young man, it being an accepted fact that young persons are more receptive as a group to such psychiatric evidence.

"THE COURT: Overruled, and I don't believe the statement that is made about

psychiatric evidence, and it is my personal opinion that young people would be more likely to order the death penalty than older people, so that you will have my notions about it. I shall overrule the motion."

qualified. But we also observed that Congress has prescribed no particular method of jury selection; that the method rests largely in the sound discretion of the trial court and its officers under the guidance of the pertinent statutes; that there is a presumption that the jury officials have discharged their duties properly; and that when the defense claims the existence of a fatal flaw in the selection process, it has the burden of overcoming that presumption. We held that the sponsor system is not in itself an invalidating factor, citing Walker v. United States, 93 F.2d 383, 391 (8 Cir. 1937), cert. denied 303 U.S. 644, 58 S.Ct. 642, 82 L.Ed. 1103, and we pointed out that a sponsor's recommendation was not the sole feature of the selection process in Nebraska. See Scales v. United States, 367 U.S. 203, 259, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), affirming, on this point, 260 F.2d 21, 45 (4 Cir. 1958); United States v. Hoffa, 349 F.2d 20, 29–33 (6 Cir. 1965), cert. granted as to other issues, 382 U.S. 1024, 86 S.Ct. 645, 15 L.Ed.2d 538 and affirmed, 382 U.S. 1024, 86 S.Ct. 645, 15 L.Ed.2d 538 (1966).

We also noted in *Beatrice* that no claim was there made that the jury was not representative of the community in that an eligible group had been excluded in its selection. The defense in the present case attempts to differentiate by asserting that groups were eliminated, namely, the academic community of the University of Nebraska, and younger and more transient people. It is argued that "in a murder insanity case it is accepted by experienced trial attorneys that older persons and persons who have lived for a long time in one community are less likely to accept an insanity defense than younger persons and persons who have lived in several localities"; that persons connected with a university move more often and are not well known in the community; that such persons should be represented in the venire; that the longtime residents are not the whole community; and that the views of older persons and of longtime residents toward mental ill-

ness and toward capital punishment are not the community attitude.

But proof of all this is totally lacking. Further, we share the trial court's skepticism about the accuracy of the defense statement as to psychiatric testimony and younger people. We also note that at least one juror on the panel was the widow of a professor of engineering at the University and that the panel contained many persons who possessed college degrees or who had attended college for one or more years.

■ As we have noted, the burden of proof is on the defense as to this feature of its attack on jury selection. That burden is not met by generalizations, unsupported by specific proof, as to attitudes of age and other groups toward mental illness, psychiatric testimony, and capital punishment.

We suspect that the source of much of the defense suspicion here lies in the respective paragraphs quoted from the clerk's form letter to suggesters and from the clerk's letter of April 25, 1966, to defense counsel. Despite the former's references to persons of "good character, and who possess integrity, sound judgment, and a sense of responsibility", we certainly cannot hold on this record, as the defense argues, that the suggester system "may result in a jury biased" toward the very kind of people so described. The paragraph in the other letter is directed to the sponsor, not the juror whom he suggests.

The defense urges upon us Rabinowitz v. United States, 366 F.2d 34 (5 Cir. 1966 er. banc). We are frank to say that a careful reading of the several opinions filed in that case affords us little effective assistance in resolving the issues presently before us. The opinions reveal a sharply divided court, with Judge Brown, although fully concurring in the result, noting, p. 72, that he joins the bare majority "In order to avoid a 4-to-4 deadlock", and that, "having so declared, I am not at all certain just what is decided".

That case, as this one does not, pivoted precisely on the race issue and civil rights, and, p. 37, "the question of whether the method by which the jury list was compiled resulted in the impermissible exclusion of Negroes". The result was a condemnation of the Georgia system in its specific operation. Further, the government itself in *Rabinowitz* conceded that the jury lists were inadequate. Judges Bell, Gewin and Coleman concurred partially in the result simply because the prosecution recommended new trials.

We, of course, do not express disagreement with *Rabinowitz* on its facts. The majority opinion there does not hold that a suggester system is per se inadequate. Consequently, we do not regard *Rabinowitz* as authority for a conclusion in our present case that the Nebraska system, in its operation and as applied to the selection of Duane Pope's jury, violated either constitutional principles or federal statutes. As already has been noted, the defense argument here centers in a claim that the Nebraska system operates to exclude the younger person, the member of the university community, the more transcient individual, and the one possessed of bias toward capital punishment. The last factor we discuss in greater detail in the next subsection. The others, it seems to us, as we have said, rest on theoretical considerations and assumptions and fail for lack of proof.

B. Conscientious objection to capital punishment. The trial judge on voir dire excused those persons who confessed having scruples against capital punishment and who answered affirmatively when asked whether this "would prevent you from imposing the death penalty if you conscientiously felt that such a verdict was proper under the law and under the evidence as you understood it". The defense suggests that this leaves only those who "believe in capital punishment"; that such persons are more likely to convict and to impose harsher punishment, when they have a choice, as they do under 18 U.S.C. § 2113(e), and are less likely to accept a defense of insanity; and that conscientious objectors should be subject to elimination only by the government's exercise of peremptory challenges. Much of this argument seems to emanate from Oberer, Jury Selection, the Death Penalty, and Fair Trial, published in The Nation, April 6, 1964, and republished in 71 Case and Comment, No. 4 (1966). In addition, the defense supported its unsuccessful pretrial "Motion to restrict to peremptory challenges the United States attorney's challenges in voir dire of persons having scruples against capital punishment" with the citation of two studies, namely, Zeisel, Some Insights Into the Operation of Criminal Juries (confidential first draft, November 1957, unpublished), and Wilson, Belief in Capital Punishment and Jury Performance (apparently also unpublished). The defense also argues that, because its offer to produce the authors of those studies for cross-examination was refused, the authors' "findings", for purposes of the appeal, must be accepted.

We think that this does not at all follow. Despite this case's character and an amount of notoriety, the record does not indicate that there was any great difficulty or consumption of an inordinate amount of time in selecting the jury. Under Rule 24(b), Fed.R.Crim.P., each side possessed 20 peremptory challenges plus one for the four alternates in the panel. Consequently, the panel contained 52 plus the four alternates. Under the careful guidance of an experienced and able trial judge the selection of the final jury of 12 and two alternates was completed in two average length days. As we read the record, 27 persons were excused for cause. Of these, only 10 were dismissed because of scruples against capital punishment. Others were asked to stand aside because of acquaintanceship, general bias, bias due to publicity, or other reasons. Few, if any at all, can be suspected of using a claim of bias as an excuse not to serve. We get no impression that this was a "blue ribbon jury". See Fay v. People of State of New York,

332 U.S. 261, 267–268, 270, 287–289, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947).

■ We also note that, on the other hand, among those excused by the trial court were three persons who indicated a tendency toward insistence on capital punishment, apart from other evidence, for a defendant who would admit a bank robbery accompanied by a killing. Thus we have a purposeful and successful effort by the trial judge to obtain persons who were not prejudiced either for or against capital punishment. This was a search for neutral jurors who would follow the court's instructions. It is not demonstrated to us that this attempt was unsuccessful or that, as the defense appears to assume, the panel was left with only those persons who "believe in capital punishment". The defense position comes down to a demand, not for an impartial jury which is neutral, but for something quite different, namely, a jury which includes persons who are prejudiced against—and, also, possibly for—capital punishment.

We are also not persuaded by the argument that the trial court's exclusion of these persons served improperly to produce a panel which was something less than representative of the community. In a narrow sense this might be said but one could say the same thing in the same sense when a court very properly asks those persons to step aside who are personally acquainted with counsel for the prosecution, or who cannot read, or who cannot understand the English language. To that extent the panel is always a little less than representative of the community as a whole. But this exclusion does not produce an unfair jury or an illegally unrepresentative one or one which is not impartial in the Sixth Amendment sense. See 48 A.L.R.2d 560, 581–84 (1956).

All the defense arguments have been completely and sweepingly answered, we feel, in the opinion of Judge Prettyman in Turberville v. United States, 112 U.S. App.D.C. 400, 303 F.2d 411, 418–421 (1962), cert. denied 370 U.S. 946, 82 S.Ct. 1596, 8 L.Ed.2d 813 and in the opinion of Judge Hincks in United States v. Puff, 211 F.2d 171, 180–186 (2 Cir. 1954), cert. denied 347 U.S. 963, 74 S.Ct. 713, 98 L. Ed. 1106. It is well pointed out, in either or both of those opinions, that "The point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn"; that the thesis that persons who are not opposed to capital punishment are psychologically inclined against criminals, and thus are not impartial, has not been judicially recognized; that "Being not opposed to capital punishment is not synonymous with favoring it"; that persons "may be completely without a controlling conviction one way or the other on either subject"; and that if a jury is to include persons with scruples against capital punishment, it ought also to include those with bias in favor of the death penalty, yet this would produce a balanced, rather than an impartial jury.

We are in accord with the reasoning and the holdings in *Turberville* and in *Puff*. See Manuel v. United States, 254 F. 272, 274 (8 Cir. 1918); Orfield, Trial Jurors in Federal Criminal Cases, 29 F.R. D. 43, 71 (1962).[3]

We find nothing whatsoever in Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), Thiel v. Southern Pac. Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), and Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), which compels or indicates a contrary conclusion.

C. Political and religious beliefs. Among the questions which the defense asked the court to submit to the venire, and which were refused, were ones relat-

3. We note, however, that the opposite view prevails in South Dakota and in Iowa. State v. Garrington, 11 S.D. 178, 76 N.W. 326 (1898); State v. Lee, 91 Iowa 499, 60 N.W. 119, 121 (1894).

ing to church affiliation, the John Birch Society, and public question attitudes.[4]

As to these, the defense urges:

"The reason the questions were asked again related to the issues in the case, i. e. insanity and capital punishment. The appellant believed that persons sympathetic to the John Birch Society would be more punitive than the general public, and that persons who belonged to religions that emphasize free will would be less willing to accept psychiatric testimony that is Freudian and based on a philosophic view of determinism. Whether such views are correct is not the issue. * * * [P]eremptory challenges for such reasons are proper. To prevent the appellant from obtaining such information is to prevent the peremptory challenges."

The defense cites Swain v. State of Alabama, 380 U.S. 202, 218–221, 85 S.Ct. 824, 836, 13 L.Ed.2d 759 (1965), and Mr. Justice White's comments there on the use and nature of the peremptory challenge, including,

"It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. * * * It is well known that these factors are widely explored during the voir dire, by both prosecutor and accused, * * This Court has held that the fairness of trial by jury requires no less. * * Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context

of the case to be tried" [citations and footnotes omitted],

and Kiernan v. Van Schaik, 347 F.2d 775, 781 (3 Cir. 1965), where it was said that "at least the visible ties which generally bind men to one side of a cause are clearly within the limited range of appropriate interrogation on *voir dire*". The argument then is that religious and group affiliations are necessarily proper subjects of inquiry.

We ourselves know of at least two Supreme Court cases where religious inquiry was recognized or approved: Aldridge v. United States, 283 U.S. 308, 313, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); Miles v. United States, 103 U.S. 304, 309–311, 26 L.Ed. 481 (1881).

But there can be no fixed rule as to all this. Denominational affiliation or group membership may indeed possess sufficient significance to call for voir dire inquiry in a given case. In another it may not. See Yarborough v. United States, 230 F.2d 56, 63 (4 Cir. 1956), cert. denied, 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487. The key in the *Swain* quotation is the phrase "in the context of the case to be tried".

The matter, thus, is one appropriately fitted for the discretion of the trial court. The Third Circuit, in *Kiernan,* supra, p. 778 of 347 F.2d, described this as "a wide discretion" which, however, is "subject to the essential demands of fairness". Much the same thing was said in United States v. Napoleone, 349 F.2d 350, 353 (3 Cir. 1965). In Aldridge v. United States, supra, p. 310 of 283 U.S., p. 471 of 51 S.Ct., the Court said that the trial court "had a broad discretion as to the questions to be asked". The issue comes down to a question of abuse of discretion. Stephan v. Marlin Firearms Co., 353 F.2d 819, 822 (2 Cir. 1965), cert. denied 384 U.S. 959, 86 S.Ct. 1584, 16 L.Ed.2d 672.

---

4. "12. Do you have a religious or church affiliation?

"13. If so, what is it?

* * * * *

"25. Have you heard of the John Birch Society?

"26. Do you feel that the John Birch Society is a good influence in this country?

"27. In your opinions on public affairs would you classify yourself as a conservative, a liberal, or a middle-of-the-road person?"

Certainly, Rule 24(a), Fed.R.Crim.P., contemplates no more.

■■■ We see no abuse here. While one might say that the trial court permissively could have been a little freer in its inquiry into group affiliations, we certainly ascertain nothing approaching prejudicial error. As the cases recognize, there are practical limitations to voir dire. If this were not so, delay and frustration would ensue and the possibility of abuse would increase.

We specifically note the court's inquiry of each venireman as to whether he entertained capital punishment scruples attributable to "faith, belief, religion, conscience, or otherwise", as well as to such scriptural and ethical references as "An eye for an eye and a tooth for a tooth" and "Those who live by the sword shall perish by the sword". These inquiries, of themselves, penetrated those very areas which the defense, by its proffered questions, sought to search.

IV. The right to present evidence as to mitigation and rehabilitation. Dr. J. M. McDonald, psychiatrist and expert witness for the government, testified on cross-examination in response to the question, "What type of sickness is involved here?", that Pope had a schizoid personality. He also said that "he could benefit from psychiatric treatment". The next question was "And what would be the nature of that treatment; I mean what would it accomplish?" The government's objection to this "as outside of the issues of this lawsuit" was sustained. On the direct examination of its own expert, Dr. Herbert C. Modlin, the defense asked whether Duane needed medical treatment. The doctor answered, "Yes, I would say so, very definitely". When the defense attempted to continue this line of inquiry, a government objection was again sustained. The defense then offered to prove by its witness that Pope required institutional commitment and medical treatment probably for at least seven years "before there could be any reasonable hope of being secure against another schizophrenic reaction".

The court also refused permission to the defense to subpoena and produce a letter written in July 1965 by the Deputy Attorney General of the United States to the Chairman of the House Committee on the District of Columbia stating "We favor the abolition of the death penalty" and recommending a comprehensive study.

All this, says the defense, is error and a violation of the defendant's right of allocution before the sentencing body.

Allocution is prescribed by Rule 32(a), Fed.R.Crim.P.[5] Its nature and importance are made evident by the several opinions in Green v. United States, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961), and Hill v. United States, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), although the Court in both those cases denied post-conviction relief, and in Machibroda v. United States, 368 U.S. 487, 489, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). We have said ourselves that allocution in the federal system is a substantial right and that "failure to accord it would perhaps entitle a defendant to have his sentencing proceedings reversed through an appeal". Moore v. United States, 329 F.2d 821, 822 (8 Cir. 1964), cert. denied 379 U.S. 858, 85 S.Ct. 114, 13 L.Ed.2d 61.

The difficulty, of course, centers in the language of 18 U.S.C. § 2113(e) to the effect that the convicted defendant "shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct". The obvious argu-

---

5. Rule 32(a) at the time of the trial read:
   "Before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment".

   As amended effective July 1, 1966, it reads:

   "Before imposing sentence the court shall afford counsel an opportunity to speak on behalf of the defendant and shall address the defendant personally and ask him if he wishes to make a statement in his own behalf and to present any information in mitigation of punishment".

ment is that, inasmuch as it lies within the power of the jury to impose the death sentence, the jury's task involves more than the mere determination of guilt or innocence and it is entitled to receive information as to mitigation and rehabilitation.

We note initially that this record is not devoid of this very kind of information. Both Dr. McDonald and Dr. Modlin, as our comments above show, had testified of illness and of Duane's need for treatment, and thereby had intimated at least the possibility of rehabilitation. And the defense in its closing argument asserted that two psychiatrists said "that right now Duane needs medical treatment".

But this question of the propriety and allowable extent of allocutional information under this statute is not an easy one. The question largely disappears when criminal procedure takes its traditional course and punishment is imposed from the judge's bench rather than in the jury room. And perhaps it holds less significance when the statute provides that the extreme penalty follows automatically, rather than permissively, upon determination of guilt. The issue seems to suggest the possibility of the two-stage trial, with the first stage devoted to the usual routine of ascertaining innocence or guilt and with the second, if guilt is determined, devoted to consequences.

The Second Circuit struggled with this problem in United States v. Curry, 358 F.2d 904, 913–916 (2 Cir. 1966). The court held that under all the circumstances of that case the trial court did not abuse its discretion in conducting a unitary trial and, flatly, that the unitary trial did not prejudice the defendant, "particularly in light of the fact that he never specifically requested the two-stage trial". Chief Judge Lumbard went on to observe that historically there is no authority for the power to direct a two-stage trial under § 2113(e); that the Supreme Court has upheld statutes of this kind under the assumption that they provide for a unitary trial; that, how-

ever, such a trial "can be highly unsatisfactory"; that some states by statute now require the two-stage trial; that since the unitary trial poses fundamental problems, "we do not interpret the silence of Congress on this question as precluding the trial judge from confining the first presentation to the jury to the issue of guilt"; that, however, it would be unwise to require the two-stage trial in every case under the statute; that the divided trial may not always work to the defendant's advantage; that it is best to leave this to the discretion of the trial court; that if the defense feels it is under a disadvantage in a unitary trial it should move for the severance of the issues of guilt and sentence; that § 2113 (e) is constitutional; that under all the circumstances it was in the court's discretion to reject the unsupported assertion that unitary trial would force the defendant to take the stand; and that for the future, where it is clear that the defendant requests a two-stage trial, "it would be preferable to grant such a request".

Judge Hays dissented. He stated that "the course of enlightened and efficient administration of the criminal law will best be served by requiring a two-stage trial"; that there is "scarcely any authority" to support the majority's conclusion that this is to be left to the discretion of the trial court; and that rational determination of punishment requires that the sentencing authority have wide access to information of a mitigating nature.

The problem also arose in Frady v. United States, 121 U.S.App.D.C. 78, 348 F.2d 84 (1965 en banc), cert. denied 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160. It was resolved by a 5-to-4 vote setting aside death sentences with directions for the entry of new sentences of life imprisonment. The court was concerned with a District of Columbia statute which, upon conviction of first degree murder, called for death "unless the jury by unanimous vote recommends life imprisonment". Judge Fahy, speaking for a bare minority of four, would hold that

the convictions were proper but that the death sentences were wrongfully imposed due to an erroneous instruction and inadequacy of the poll. Because there were only two sentencing alternatives and because it was not possible to reconvene the same jury, those four judges felt that the appropriate solution was to direct the entry of life sentences as "just under the circumstances", within the language of 28 U.S.C. § 2106, authorizing an appellate court to modify or set aside any judgment brought before it for review "or require such further proceedings to be had as may be just under the circumstances". See Coleman v. United States, 123 U.S.App.D.C. 103, 357 F.2d 563, 572-573 (1965).

Judge McGowan, on procedural grounds, concurred in the result reached by the four judges and thus effected a majority. He felt that the situation would be best resolved by the two-stage trial; that there was nothing indicative of a hostile attitude toward this on the part of Congress; and that the court was free to prescribe that procedure "as the one best fitted to effectuate the purpose of Congress in this statute". Judge Wright voted to reverse the convictions because of insufficiency of evidence. He felt, too, that the defendants were not afforded adequate opportunity to offer evidence in mitigation and that the two-stage trial procedure would resolve this difficulty.

Judge Wilbur K. Miller and three others concurred in the affirmance of the convictions but dissented from the setting aside of the death sentences. He stated that there was no justification in statute or case law for the majority's imposition of the life sentences; that the court exercised the pardoning power in so doing; that there was no majority opinion except as to the affirmance of the convictions; and that there was an indication that the motivation behind three of the majority "is an ingrained personal antipathy to capital punishment".

Judge Burger, who was one of the dissenters, also filed a separate opinion, joined by his colleagues in dissent, with particular emphasis as to the suggested two-stage trial. He felt that the statute itself and its relevant history demonstrate that the traditional single trial is what was intended, with the jury having a dual function on guilt and on penalty, and that Congress' silence was not a license to judges to change this long-established procedure at their convenience. He then outlined, pp. 115–116 of 348 F.2d, the many questions which the divided procedure would present and suggested "the utter folly of institution of such a system except after careful study of all its ramifications" by the legislative body.

It is evident from these decisions of the Second and District of Columbia Circuits that we find ourselves, as to this issue, in a developing area of the law. It is somewhat strange that, with several other federal statutes also giving the jury the choice between capital punishment and a lesser sentence, see 18 U.S.C. §§ 1111, 1201 and 1992, this issue has not surfaced earlier and been resolved sometime ago. This may be due to an assumption on the part of court and counsel alike that the unitary trial was the established procedure.

*Frady* and *Curry,* being both by split courts, provide us with something less than assured precedent. *Frady,* of course, involves a local statute. *Curry* centers on the trial court's discretion but takes leave of the issue with the strong suggestion that in the future, upon request, the preferable course is the two-stage trial. Judge Burger in *Frady* presents an imposing list of emerging questions which seem best resolved by legislative action only after careful study, rather than by judicial experimentation necessarily based on personal inclination. And we are not convinced that the District of Columbia Circuit's reliance upon and use of 28 U.S.C.A. § 2106, although somewhat appealing and, if warranted, providing a convenient solution, is appropriate or indicated.

We note here, as Chief Judge Lumbard noted in *Curry,* that the government

introduced little or no evidence relevant to punishment (although the defense asserts that the surviving victim's testimony as to his condition so qualifies) and that at no time in the presentation of evidence did it suggest the death penalty. The only references to this in the entire trial were the court's inquiries on voir dire; the prosecution's comment in its opening statement as to the jury's obligation to determine penalty; the assistant United States Attorney's final comments in the initial closing argument to the jury, including, "If he is guilty, and you so find, let the punishment fit the crime"; the United States attorney's remark at the very end of the final argument, "The details of this crime certainly do not call for less than the maximum penalty"; and the defense's own references to "life is at stake", "facing the death penalty", "something bad" and "revenge" in its closing argument.

Our situation is one where there was no formal request for a two-stage trial, either before the trial began or at the close of the government's case or on the post-trial motions. As we have pointed out, despite the court's refusal to permit the defense to probe in depth the psychiatrist-witnesses' comments about rehabilitation, it was evident, from their references to Pope's illness and the probable time required for hospitalization and treatment, that rehabilitation might be possible or, if the extreme penalty was not imposed, that commitment, by some means, was indicated. The jury also had the full picture of the defendant's background, his prior behavior, and the like. And the defense of insanity, with all its implications, is in itself wholly mitigative and rehabilitative in nature. The jury therefore was not without an appropriate measure of information.

We find ourselves about where the Second Circuit majority found itself in *Curry*. We are not disposed to say that, despite the long accepted unitary trial concept, the two-stage trial is not available at all. We are not disposed to say that a trial judge may not appropriately exercise his discretion in this area. But we are also not disposed to say that the trial court's failure to order *sua sponte* a two-stage trial for Duane Pope was error or an abuse of discretion.

It may be that the two-stage trial can be appropriately developed and made to serve a useful purpose under these statutes as they presently exist. It may be that the better solution is for the statutes to be revised so as to place the punishment power back in the hands of the judge where it traditionally has rested. It may be that the ultimate answer is legislation authorizing some narrow appellate review of sentences in these extreme cases. These, however, are primarily legislative matters for the Congress and not for the judiciary.

We conclude on this record that the defense was not deprived of all opportunity to present information as to rehabilitation and mitigation; that substantial evidence as to this was appropriately admitted; that the trial court's refusal to permit further exploration in depth was not improper; that the unitary trial was not error; and that nothing approaching a deprival of constitutional due process has been demonstrated here.

Our conclusion is fortified by the Supreme Court's very recent remarks in Spencer v. State of Texas, 385 U.S. ——, 87 S.Ct. 648, 17 L.Ed.2d —— (1967) about two-stage jury trial procedure. There, Mr. Justice Harlan, author of the principal opinion, said, "Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure".

V. The refused instruction as to the jury's authority not to impose the death penalty. This requested instruction follows almost verbatim the very language appearing in Mr. Justice Gray's opinion in Winston v. United States, 172 U.S. 303 at p. 313, 19 S.Ct. 212, 43 L.Ed. 456 (1899). The court's refusal is claimed to be error.

The trial court, however, did not instruct contrarily to the request. It said,

"You are instructed that your authority to punish or to not punish the defendant by imposing a sentence of death, is unlimited. I have tried to make it clear to you that the question of whether the defendant should or should not be punished by death has been committed by law solely to your discretion."

What the defense insists upon is that the language should have been expanded and detailed so that the jury knew it might range far and wide and unlimitedly.

■ We have carefully read the court's charge in its entirety. While, of course, the requested instruction might properly have been given, we conclude that its omission was not error and that the jury was adequately advised as to this feature of the case. By the charge the court did give, the jury knew its responsibility and the broad avenues open for its discussional and decisional judgment. It is not necessary that the court meticulously spell out each and every factor which the jury may consider. Its authority was stated to be "unlimited". That means without limit and could not be more directly and simply expressed. Andres v. United States, 333 U.S. 740, 742–743, 68 S.Ct. 880, 92 L.Ed. 1055 (1948), is authority and an example against the defense position.

■ VI. The refusal to instruct that a finding of not guilty results in hospitalization until cured. The defense claims that the jury was entitled to know what would happen to Pope in the event of acquittal. Specifically, it requested instructions that, under 24 U.S.C. § 211, he would be certified to the Secretary of Health, Education and Welfare, who may then order him confined to Saint Elizabeths Hospital in the District of Columbia, or to the custody of the Attorney General until his health is restored or suitable state arrangements are made. The court, instead, instructed the jury:

"[Y]ou have no right to take into consideration, in event you should find him not guilty, whether defendant would be kept in custody and if so for how long such custody would continue, or whether he would be entitled to early or immediate freedom. As a matter of fact, the matter should not even be discussed by you in determining the issue of sanity or insanity. You are to determine only whether the defendant is guilty or not guilty as charged. Speculation as to the possibility of his being in custody, its place, or its duration, or the possibility of his walking out of the courtroom a free man, if either or both of such possibilities exist, should not enter into your determination of guilt or innocence under the plea submitted."

The defense would justify its position primarily upon the authority of Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725, 728 (1957), cert. denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067, and Pollard v. United States, 285 F.2d 81 (6 Cir. 1960). We, however, find no error and see no reason why we should depart from the long-established principle that, in the absence of some specific statutory provision, a defendant's disposition is not a matter for the jury's concern. *Lyles* had to do with a District of Columbia statute and a special plea of not guilty by reason of insanity. And *Pollard* concerned an order, not a jury instruction. In addition, the Sixth Circuit's intimation, in *Pollard* and in its earlier opinion in the same case, supra, p. 464 of 282 F.2d, that 24 U.S.C. § 211, with its provision for certification to the Secretary and possible confinement in Saint Elizabeths Hospital, is available to federal defendants outside the District of Columbia, is not shared in other quarters. See Sauer v. United States, 241 F.2d 640, 651 (9 Cir. 1957), cert. denied 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539; United States v. Currens, 290 F.2d 751, 775–776 and 777 (3 Cir. 1961); United States v. Freeman, 357 F.2d 606, 625 (2 Cir. 1966); Pope v. United States, 298 F.2d 507, 509 (5 Cir. 1962); Powers v. United States, 305 F.2d 157, 158 (10 Cir. 1962); Lynch v. Overholser, 369 U.S.

705, 729–730, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962) (dissenting opinion of Mr. Justice Clark); United States v. Roe, 213 F.Supp. 444, 455–456 (W.D.Mo. 1963), and cases cited; 17 Op. Att'y Gen'l 211 (1881); S. 3689 and S. 3573, introduced in the 89th Congress.

We, too, hope that this gap, if it exists, in the federal system may soon be adequately remedied.

We should note that in its closing argument to the jury the defense made what appears to be at least a collateral reference to Pope's possible custody in the event of acquittal:

"I wonder if you might in your deliberations feel or think about some concern about his custody if you find him not guilty. * * * I think you can assume that if you do your duty as jurors * * * others will do their duty in connection with Duane."

Although permission for further comment about disposition had been denied by the court before final argument, the defense itself thus effected an implication. The court did the same in its instructions when it said, "Just as you will discharge your duty under the law and the evidence you can assume that others will do the same as to any matters for their consideration". We may not assume that all this was not apparent to the jury.

In any event, we need not attempt to pass upon the scope and application of § 211. We merely hold that the court's refusal to instruct about hospitalization was not error and that justice does not require the specifics, questionable at best, which the defense demanded.

VII. *Instructions as to the defense of insanity.* As its final point the defense urges that the trial court's instructions to the jury on criminal responsibility were not understandable, were partially inapplicable to this defendant, and were partially useless. The charge on this aspect of the case is too long to reproduce here in its entirety but we set forth its critical portion in the margin.[6] It speaks

6. "In order for a person to be criminally responsible for the doing of a criminal act, he must have been sane at the time he committed it. If he was not sane at the time he committed the criminal act, then under the law he is held to be not guilty by reason of insanity of any criminal charge based on such act. This is because the law does not hold a person criminally accountable for his conduct while insane, since an insane person is not capable of forming the intent essential to the commission of a crime.

"Under the law a person who commits a criminal act is sane if (a) at the time he had sufficient mental capacity and reason to distinguish right from wrong as to the particular act and if (b) he had the mental capacity and reason to understand the nature and character of the act and its consequences and if (c) his doing of the act was not occasioned by an uncontrollable or irresistible impulse.

"In the present case, in order to convict the defendant of the offenses charged, the burden of proof is upon the government to establish beyond a reasonable doubt that the defendant was sane at the time he committed the offenses charged. The defendant is not called upon to prove that he was insane at that time.

"As heretofore stated, defendant has admitted committing the offenses charged. The sole issue in connection with the charge in each of Counts I through VI, inclusive, is therefore whether or not the defendant was sane at the time of the commission of the acts and offenses charged.

"In order for the government to establish that the defendant was sane at the time he committed the offense charged in each separate count, it must establish beyond a reasonable doubt each and all of the three following propositions, to-wit:

"(1) That at the time of the commission of the offense charged, the defendant had the mental capacity and reason to distinguish between right and wrong as to such offense.

"(2) That at the time of the commission of the offense charged, the defendant had sufficient mental capacity and reason to understand the nature and character thereof and the consequences of such offense.

"(3) That he did not commit the offense charged by reason of uncontrollable or irresistible impulse.

A person acts from an uncontrollable or irresistible impulse when he does an act not because of a desire and intention

for itself. Objections were made on the ground that the instructions should have embraced what are called the Durham elements or the Currens elements, both referred to below, or alternative language proffered by the defense.

The defense argues that one of the reasons for what it sees as continuing judicial support of the rule which emerged from M'Naghten's Case, 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (1843), is that it protects the public; that the rule's purpose is to make it easier to convict; that implicit in its approval is the understanding that it should not be applied in capital cases; that the instruction given requires a jury to convict and sentence to death a person psychiatrists for both sides agree is sick; that the irresistible impulse refinement does not at all assist the person who is partially successful in resisting his sick desires; that M'Naghten "allows acquittal only of persons really not capable of standing trial"; that the jury here must have placed great emphasis on the word "impulse"; and

that M'Naghten and irresistible impulse should be rejected.

This, of course, as both sides recognizes, is not a new issue for this court or, indeed, by now, for most American tribunals. Because, however, criminal responsibility in the federal courts "is a rule of decision", Wion v. United States, 325 F.2d 420, 425 (10 Cir. 1963), cert. denied 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309; United States v. Freeman, 357 F.2d 606, 614 (2 Cir. 1966), it is not inappropriate that, sitting en banc, we examine it once again.

We last fully considered the issue in Feguer v. United States, 302 F.2d 214, 242–245 (8 Cir. 1962), cert. denied 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110, a capital case. There we observed, as we had also done earlier in Dusky v. United States, 295 F.2d 743, 759 (8 Cir. 1961), cert. denied 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536, the following:

1. This court, as nearly all others, heretofore has consistently and specifically refused to follow the unembellished

---

to commit the same but is moved to do so because of an impulse which he is not able to control or resist, or in other words, that he was unable to prevent himself from committing it.

\* \* \* \* \*

"In referring to the mental capacity and reason of the defendant to distinguish between right and wrong, I charge you, as I indicated during the examination of one of the psychiatrists, that you are not interested in his knowledge or moral judgments as such or the rightfulness or wrongfulness of things in general. You must make a determination as to the defendant's knowledge of wrongfulness so far as the acts charged are concerned. This could be stated as his capacity to conform his conduct to society's standards or, in more commonplace language, whether the defendant was aware when he committed the acts charged that his acts were a violation of law.

" 'Insane,' as used in this charge, means such a perverted and deranged condition of mental and moral faculties as to render a person either incapable of distinguishing between right and wrong, or incapable of knowing the nature of the act he is committing; or, even where a person is conscious of the nature of the act he is committing, and is able to distinguish

between right and wrong, and knows that the act is wrong, yet his will—the governing power of his mind—has been so completely destroyed that his actions are not subject to it, but are beyond his control.

\* \* \* \* \*

"If the government has established each and all of the foregoing propositions numbered (1), (2) and (3) beyond a reasonable doubt, then it has established beyond a reasonable doubt that the defendant was sane at the time he committed the offenses charged. If the government has failed to establish beyond a reasonable doubt any or all of the foregoing propositions numbered (1), (2) and (3), then you should find the defendant not guilty by reason of insanity.

"The burden cast upon the government in this case does not require that the government prove that the defendant was not mentally ill in any degree at the time of the commission of the offenses charged. It does require that the evidence adduced be sufficient to convince and satisfy you beyond a reasonable doubt that the defendant was sane and was not insane at the time of the commission of the offenses within the meaning of the test which I have previously outlined to you."

"product of mental disease or mental defect" standard, first enunciated in New Hampshire a century ago, State v. Pike, 49 N.H. 399 (1870), and adopted for the District of Columbia in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), and then so vigorously contested in Durham's numerous progeny. Voss v. United States, 259 F.2d 699, 703 (8 Cir. 1958); Dusky v. United States, 271 F.2d 385, 394, 401 (8 Cir. 1959), reversed on other grounds 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824; Dusky v. United States, supra, p. 759 of 295 F.2d. We adhered to this rejection in Feguer, p. 243 of 302 F.2d. See Carter v. United States, 332 F.2d 728, 729 (8 Cir. 1964), cert. denied 379 U.S. 841, 85 S.Ct. 79, 13 L.Ed.2d 47.

2. The origin, history, application, and variations of M'Naghten have been reviewed in detail adequately and at length in many places, as, for example, Durham v. United States, supra, pp. 869–874 of 214 F.2d, and United States v. Currens, 290 F.2d 751, 763–767 (3 Cir. 1961), (and now United States v. Freeman, 357 F.2d 606, 615–622 (2 Cir. 1966)). They need no further and repetitive recital by us.

3. The Supreme Court of the United States has approved charges embracing M'Naghten and irresistible impulse (perhaps preferably to be described in terms of uncontrollable acts) and certainly thus far has not disapproved that approach to the problem of criminal responsibility. Davis v. United States, 160 U.S. 469, 476–478, 16 S.Ct. 353, 40 L.Ed. 499 (1895); Davis v. United States, 165 U. S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750 (1897), where the Court said that such a charge "was in no degree prejudicial to the rights of the defendant"; Hotema v. United States, 186 U.S. 413, p. 420, 22 S.Ct. 895, p. 898, 46 L.Ed. 1225 (1902), where the Court said, that the whole charge "properly laid down the law in regard to the responsibility of the defendant on account of his alleged mental condition" and where the Court, pp. 418 and 416, p. 897 of 22 S.Ct., characterized as "undoubtedly correct" a charge which permitted excuse only if the degree of the imbalance "must have been sufficiently great to have controlled the will of the accused"; and Matheson v. United States, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631 (1913), where the Court noted that the "exact charge" used in the Davis case was again employed.[7] See, also, Fisher v. United States, 328 U.S. 463, 467, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), and Leland v. State of Oregon, 343 U.S. 790, 800–801, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), where the Court held that federal due process did not yet require a state to adopt an irresistible impulse test of legal sanity in place of a right and wrong test.

4. This court has been familiar with the various expressions on criminal responsibility illustrated not only by M'Naghten, Pike, Durham and Currens, but, as well, by State v. Jones, 50 N.H. 369 (1871), and Parsons v. State, 81 Ala. 577, 2 So. 854 (1887), and the more recent Sauer v. United States, 241 F.2d 640 (9 Cir. 1957), cert. denied 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539 and Blocker v. United States, 110 U.S.App. D.C. 41, 288 F.2d 853 at p. 857, (1961), particularly Judge Burger's enlightening opinion, concurring in result, (and now McDonald v. United States, 114 U.S.App. D.C. 120, 312 F.2d 847 (1962),[8] and United States v. Freeman, supra).

---

7. Chief Judge Biggs has observed, evidently after a review of the original record, that the trial judge in the Matheson case also charged, "If you believe that the shooting was the direct result or offspring of insanity, you should acquit, if of passion or revenge, you should convict". He regards this language as "very close to the essentials of the Durham formula stripped of all glosses".

United States v. Currens, supra, p. 768 of 290 F.2d.

8. The District of Columbia Circuit, within a few years after Durham, manifested an enlarging disenchantment with the pure "disease-product" test, chiefly because of shifting diagnostic definitions of mental disease, see Blocker v. United States, supra, p. 860 of 288 F.2d (sepa-

.5. That in summary and conclusion,

" * * * [W]e would hesitate to reverse a case where the trial court had employed instructions on insanity which this court has heretofore approved and henceforth we would be loath, indeed, to reverse where, as here, the trial court has used instructions, whether based theoretically on a *M'Naghten* variation or on the test set forth in the Modern Penal Code proposed by the American Law Institute or on that form revised as suggested by the Third Circuit in *Currens,* or whether couched in still other language, *if* the charge appropriately embraces and requires positive findings as to 3 necessary elements, namely, the defendant's *cognition,* his *volition,* and his *capacity to control* his behavior. If those 3 elements—knowledge, will and choice—are emphasized in the court's charge as essential constituents of the defendant's legal sanity, we suspect that the exact wording of the charge and the actual name of the test are comparatively unimportant and may well be little more than an indulgence in semantics. We think this approach to be sound because it preserves and builds upon those elements of *M'Naghten* and of irresistible impulse which are acceptable in these days and yet modernizes them in terms which a jury can grasp and apply."

Sitting now en banc, we have once again reviewed the many federal opinions, some most scholarly and erudite, which concern this problem and we are aware of the continually developing and assertedly different approaches to it. We have endeavored, in the Appendix, to set forth, as we see them, the other circuits' announced attitudes as of the moment. As a full court we have gone through the same decisional struggle experienced by our respective panels which sat in *Voss,* the first *Dusky,* the second *Dusky,* and *Feguer,* and by the other federal courts of appeals in the cases we cite. We still entertain a deep suspicion that, despite the welter of legal, psychiatric, and philosophic theory and verbiage, much of the legal problem is basically semantic and engulfed in words, and that a practical American jury in any given case (except, possibly, upon the McDonald-Durham approach), will reach the same conclusion, whether it be instructed along traditional *M'Naghten* and irresistible impulse lines, or upon any of the approaches of *Currens* or *Freeman* or variations thereof. Perhaps, as Judge Brown has suggested in dissent, "we should quit talking in terms of *McNaghten, Davis, Durham, Howard, Parsons,* or the rest". Carter v. United States, 325 F.2d 697, 708 (5 Cir. 1963), cert. denied 377 U.S. 946, 84 S.Ct. 1353, 12 L.Ed.2d 308. See, also, Judge Griffin B. Bell in dissent in the same case, p. 707 of 325 F.2d.

---

rate opinion of Judge Burger) and a lack of definition or clear meaning of the term "product". Dissenting members of that circuit pointed out that unless the prosecution could carry the enormous burden of showing that there was no nexus whatsoever between the mental state and the act, an acquittal usually resulted. This dissenting view appears finally to have prevailed, and in McDonald, p. 851 of 312 F.2d, it seems to us, there emerged a significant change by way of a definition of mental disease as meaning, in the context of the criminal case, a disease which "*substantially* affects mental or emotional processes and *substantially* impairs behavior controls. * * * The jury must determine for itself, from all the testimony, lay and expert, whether the nature and degree of

the disability are sufficient to establish a mental disease or defect as we have now defined those terms" [emphasis supplied]. This change had the incidental effect of giving some meaning to "product", that is, if the jury believes the disease does not substantially impair behavior controls, it is free to find that the disease did not "produce" the act. We thus see the metamorphosis in the District of Columbia Circuit, from the former rigidities of the disease-product test to the standard of capacity for control as prescribed by McDonald. See also, the intervening cases of Campbell v. United States, 113 U.S.App.D.C. 260, 307 F.2d 597 (1962), and Frigillana v. United States, 113 U.S.App.D.C. 328, 307 F.2d 665 (1962).

So long as all relevant medical evidence is received, we see little or no difference in the practical functioning of the standards of *Feguer,* reaffirmed here, and the present state of the law in those circuits (District of Columbia, Second, Third, and perhaps the Ninth and Tenth) which have abandoned *M'Naghten* in its earliest and most rigid form and which now use some formulation embracing cognition and volition.

We hold again, and we stress by repetition, that if the trial court freely admits all evidence which appears to be relevant and *if the charge appropriately embraces and requires positive conclusions by the jury as to the defendant's cognition, his volition, and his capacity to control his behavior, and if these three elements of knowledge, will and choice are emphasized in the charge as essential and critical constituents of legal sanity, we shall usually regard the charge as legally sufficient.* And we also repeat what we said in *Feguer,* at p. 245 of 302 F.2d, and in the second *Dusky,* at p. 759 of 295 F.2d, namely, that we think this approach is sound because it preserves and builds upon those elements of *M'Naghten* and of lack of control which are acceptable in the present day, and yet modernizes them in terms which the jury can grasp and intelligently apply.

We think further that this approach does, indeed, take account of the entire man and his mind as a whole; that it enables the jury to consider all the relevant symptomatology; that it avoids undue compartmentalization of the intellect; that it appropriately recognizes the possibility of gradations in capacity; that it avoids too rigid classification; and that it embraces terms which are comprehensible to a lay jury and which enable it adequately to perform its historical function in the criminal case.

The *Davis* charge, it has seemed to us, when viewed and carefully read in its entirety, and the Supreme Court's utterances in its *Davis* decisions, recognized these three elements which we stress. See pp. 484–485 and 488 of 160 U.S., 16 S.Ct. 353. However, it is fully apparent, from our language quoted from *Feguer* and the second *Dusky,* that we do not read the Supreme Court opinions as holding that *M'Naghten* and irresistible impulse is the only permissible approach to criminal responsibility. Nowhere do we detect such exclusiveness in the Court's approval. The Third and Second Circuits analyze the Supreme Court cases in the same way. Currens, pp. 767–771 of 290 F.2d; Freeman, pp. 613–15 of 357 F.2d. So does Judge Griffin B. Bell in dissent in Carter v. United States, supra, p. 704 of 325 F.2d. And the consistent denial of certiorari in the many District of Columbia cases seems to fortify this conclusion.

When we read Judge Van Pelt's instructions in the present case, it is readily apparent, as the defense appears to concede, that the charge appropriately embraces and properly emphasizes the stated and requisite three elements of knowledge, will and choice. Indeed, his definition of "insane" follows most closely the very charge given to the jury in each of the *Davis* trials. See pp. 476–477 of 160 U.S. 16 S.Ct. 353 and p. 578 of 165 U.S., 17 S.Ct. 360. We therefore have no difficulty in holding that there is no error in that portion of the charge dealing with criminal responsibility.

In any event, we are convinced, after a careful review of the entire record, that this is not a case where the defendant could possibly have been prejudiced by the charge as given. See Judge Hastie's comment in dissent in Currens, p. 776 of 290 F.2d.

By way of addendum, we state that we expect a trial judge, in a case involving criminal responsibility, to be free in his admission of all possibly relevant evidence, to be imaginative in his charge, and to give appropriate and particular stress to the requirements of cognition, volition and capacity to control, rather than to be content with the bare bones of a traditional charge, even though it has been specifically approved by appellate opinion in the past. If this is done, effective and appropriate justice will be dispensed to the defendant who sincerely

asserts legal insanity as his defense, and it will be accomplished with responsible judicial participation in each day's advance and contribution to our knowledge of the human mind.

We join Judge Van Pelt, see United States v. Pope, 251 F.Supp. 234, 242 (D. Neb.1966), in expressing gratitude to Robert B. Crosby and Wallace M. Rudolph for their service as defense counsel on this appeal. Here, as in all the proceedings in the district court, they have represented Duane Pope well and devotedly. The length of this opinion and the nature of the issues raised attest to this. We also commend counsel for the government for their meticulous preparation and fairness in the presentation of a case which demanded the utmost in care and the avoidance of sensationalism.

Affirmed.

## APPENDIX.

We believe that the following currently sets forth the respective approaches of the several federal courts of appeals to the issue of criminal responsibility:

*District of Columbia Circuit.* The McDonald-Durham rule, as initially pronounced for the Circuit in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 874–875 (1954) ("It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect"), but as restrictedly clarified and modified en banc by McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 851 (1962) ("What psychiatrists may consider a 'mental disease or defect' for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purpose in determining criminal responsibility. Consequently, for that purpose the jury should be told that a mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls. * * * The jury must determine for itself, from all the testimony, lay and expert, whether the nature and degree of the disability are sufficient to establish a mental disease or defect as we have now defined those terms"). Also, in Heard v. United States, 121 U.S.App.D.C. 37, 348 F.2d 43, 44 (1965), it is specifically stated that *McDonald* defined "mental disease or defect" to mean "an abnormal condition of the mind which substantially impairs capacity to control behavior".

*First Circuit.* No authoritative decision. In Amador Beltran v. United States, 302 F.2d 48, 52–53 (1 Cir. 1962), the court, in response to a defense contention that *M'Naghten* is no longer the proper test of criminal responsibility, said, "We do not care to pass on this broad issue on a bare record. However, we commend to the district court's attention cases such as United States v. Currens * * * and request that, on the new trial, if it determines the defendant could properly distinguish between right and wrong, it nevertheless make further findings so that we may, if need be, give consideration to this matter".

*Second Circuit.* The American Law Institute alternative proposal as embodied in § 4.01 of its Model Penal Code. United States v. Freeman, 357 F.2d 606, 622 (2 Cir. 1966) ("A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law").

*Third Circuit.* A modification of the American Law Institute proposal. United States v. Currens, 290 F.2d 751, 774 (3 Cir. 1961) ("The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated").

*Fourth Circuit.* Apparently no recent definitive decision although there are "right and wrong" references in Hall v. United States, 295 F.2d 26, 29–30 (4 Cir. 1961). See Judge Thomsen's opinions in United States v. Hopkins, 169 F.Supp.

187, 188–191 (D.Md.1958), and United States v. Leister, 235 F.Supp. 979, 980–981 (D.Md.1964), where he appears to favor the American Law Institute approach but in each case would reach the same conclusion under any test.

*Fifth Circuit.* Apparently a *M'Naghten* variation. Howard v. United States, 232 F.2d 274, 275 (5 Cir. 1956 en banc), " * * * either the incapacity from some mental disease or defect to distinguish between right and wrong with respect to the act, or the inability from such disease or defect to refrain from doing wrong in the commission of the act * * * " Kittrell v. United States, 334 F.2d 242 (5 Cir. 1964); Merrill v. United States, 338 F.2d 763, 766 (5 Cir. 1964); Birdsell v. United States, 346 F.2d 775, 781 (5 Cir. 1965), cert. denied 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366. An attempt to establish a different rule in the Circuit failed in 1963 with an equally divided en banc court. Carter v. United States, 325 F.2d 697, 5 Cir., cert. denied 377 U.S. 946, 84 S.Ct. 1353, 12 L.Ed.2d 308.

*Sixth Circuit.* *M'Naghten* and irresistible impulse. Pollard v. United States, 282 F.2d 450, 457 (6 Cir. 1960).

*Seventh Circuit.* Probably the *M'Naghten* approach. United States v. Cain, 298 F.2d 934 (7 Cir. 1962), cert. denied 370 U.S. 902, 82 S.Ct. 1250, 8 L.Ed.2d 400, where the court approved an instruction that a person is responsible for his acts "if he is aware of what he is doing and has the mental capacity to choose between a right and a wrong course of action". But in United States v. Cooks, 359 F.2d 772, 773–774 (7 Cir. 1966), the charge approved seems to contain some A.L.I. overtones.

*Ninth Circuit.* Evidently, at the present time, *M'Naghten* and irresistible impulse. Andersen v. United States, 237 F.2d 118, 126–128 (9 Cir. 1956); Sauer v. United States, 241 F.2d 640, 642 (9 Cir. 1957), cert. denied 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539; Smith v. United States, 342 F.2d 725, 727 (9 Cir. 1965). In *Sauer* the court stated, p. 642

of 241 F.2d, that it was doubtful whether "the question is an open one". It also there observed, pp. 644–65 and 652, "[B]ecause we are required to follow the rule of M'Naghten's Case does not mean we are satisfied with it, or indorse it with absolute finality for all time to come. * * * If change there is to be, it must come from a higher judicial authority, or from the Congress". But in the very recent case of Maxwell v. United States, 368 F.2d 735 (9 Cir. 1966), "where the evidence as to any insanity was extremely meager", a Ninth Circuit panel stated, "We express no opinion * * * as to the A.L.I. proposal or variations of that proposal, nor do we now indicate either approval or disapproval of the *Davis* instruction, followed in *Andersen* and *Sauer*".

*Tenth Circuit.* Perhaps the broad approach not dissimilar to our own. What is essentially the *Davis* charge was approved in Coffman v. United States, 290 F.2d 212, 215 (10 Cir. 1961), and again by Chief Judge Murrah speaking for a unanimous en banc court in Wion v. United States, 325 F.2d 420, 424 (10 Cir. 1963), cert. denied 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309. In *Wion, Currens* is rejected "because of our unwillingness to concede that the law is unconcerned with the morals of one's conduct, for purposes of determining criminal responsibility. We proceed on the fundamental premise that moral responsibility and moral sanctions are the warp and woof of the law * * * ", p. 427 of 325 F.2d. The court then stated, p. 430, that when the defendant's mental capacity is in issue, he is not criminally responsible for his conduct "if, at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. The jury is then to be told that * * * they must be convinced beyond a reasonable doubt that at the time the accused committed the unlawful act, he was mentally capable of knowing what he was doing, was mentally capable of knowing that it was

wrong and was mentally capable of controlling his conduct. * * * The definition of insanity, as embodied in the instructions of the trial Court following Coffman, incorporated all of the elements of the A.L.I.Code". See, also, Fitts v. United States, 325 F.2d 1021, 1022 (10 Cir. 1964), cert. denied 379 U.S. 979, 85 S.Ct. 682, 13 L.Ed.2d 569; Otney v. United States, 340 F.2d 696, 699 (10 Cir. 1965); Gessner v. United States, 354 F.2d 726, 729 (10 Cir. 1965).

Little would be accomplished by listing here the approaches to the problem in the various state courts. See, however, the annotations at 45 A.L.R.2d 1447 (1956), and the supplements thereto. Of interest is the unusual result recently reached by the Wisconsin court in State v. Shoffner, 31 Wis.2d 412, 143 N.W.2d 458 (1966).

LAY, Circuit Judge (concurring).

One cannot help voicing a very hesitant reluctance to enlarge upon the excellent opinion of Judge Blackmun. My concurrence in the analysis and substance of the Court's viewpoint reflected therein is with full and firm conviction. However, I feel compelled to comment briefly upon an issue that has troubled me. This concerns the denial to the defendant herein, to exercise the right of allocution under Rule 32(a) of the Fed.R.Crim.P., which reads in part:

" * * * Before imposing sentence. the court shall afford counsel an opportunity to speak on behalf of the defendant and shall address. the defendant personally and ask him if he wishes to make a statement in his own behalf and to present any information in mitigation of punishment."

As Judge Blackmun has so perceptively analyzed, this rule has resulted in conflicting viewpoints on the two stage trial.[1] Rule 32(a) allows the court an opportunity to review all facts and circumstances "without strict evidential procedural limitations" to consider *any* information in mitigation of punishment."

Mr. Justice Black, in Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337, illustrates the inadequacy of allocution in the unitary trial, when he says:

" * * * Rules of evidence have been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged. These rules rest in part on a necessity to prevent a time consuming and confusing trial of collateral issues. They were also designed to prevent tribunals concerned solely with the issue of guilt of a particular offense from being influenced to convict for that offense by evidence that the defendant had habitually engaged in other misconduct. A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." 337 U.S. at 246–247, 69 S.Ct. at 1083.

Historically and traditionally the right to sentence a convicted criminal under common law was in the power of the trial judge. Thus, at common law "no judgment for corporal punishment could be pronounced against a man in his absence, and in all capital felonies it was essential that it should appear of record that the defendant was asked before sentence if he had anything to say why it should not be pronounced." Ball v. United States, 140 U.S. 118, at 129, 11 S.Ct. 761, at 765,

---

1. See Spencer v. State of Texas, 385 U.S. ——, 87 S.Ct. 648, 17 L.Ed.2d —— (1967).

35 L.Ed. 377. See also Schwab v. Berggren, 143 U.S. 442, at 447, 12 S.Ct. 525, 36 L.Ed. 218. However, the First Congress of the United States provided:

"That if any person or persons shall within any fort, arsenal, dockyard, magazine or in any other place or district of country, under the sole and exclusive jurisdiction of the United States, commit the crime of willful murder, such person or persons on being thereof convicted shall suffer death."

1 Stat. 113. Under this statute the trial judge was given no discretion in sentencing the defendant.[2]

The law of the First Congress was amended in 1897, adding the qualification that the verdict of jury can be "without capital punishment." The amendment to the original statute 100 years later becomes significant as a contemporaneous and desired recognition of a civilized society's concern to improve their criminal laws and punishment.[3]

The treatment of the 1897 amendment in Winston v. United States, 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456, demonstrates that the jury has unlimited discretion to grant life imprisonment even without mitigating circumstances being shown.

It would thus appear, the past history of capital punishment in federal crimes indicates that the common law rule of allocution now incorporated in Rule 32(a) has no application whatsoever in a federal jury's determination of the death sentence. Accordingly, the denial of allocution in this case, in my humble opinion, is an outgrowth from the historical background of the legislation concerning punishment for willful murder. It is also an anachronistic reach-back to the Dark Ages.[4]

This incongruity has similar roots to other related histories of our criminal law. Originally, in England, a person charged with treason or a felony was denied the aid of counsel, whereas persons accused of misdemeanors were entitled to the full assistance of counsel. As early as 1758, Blackstone commented: "For upon what face of reason can that assistance be denied to save the life of a man, which yet is allowed him in prosecutions for every petty trespass?" 4 Blackstone 355. See Powell v. State of Alabama, 287 U.S. 45, at 60, 53 S.Ct. 55, 77 L.Ed. 158.

Blackstone's concern of 200 years ago appropriately questions the denial of allocution in capital cases in our federal criminal law today. It is "a perversion of all sense of proportion" that this in-

---

**2.** Allocution under this statute (carrying a mandatory death sentence) was restricted. It was only allowed so "that the defendant might be identified by the court as the real party adjudged guilty; that he might have a chance to plead a pardon, or move in arrest of judgment; that he might have an opportunity to say why judgment should not be given against him; and that the example of being brought up for the animadversion of the court and the open denunciation of punishment might tend to deter others from the commission of similar offences." Ball v. United States, 140 U.S. at 131, 11 S. Ct. at 766. Whereas Rule 32(a) is more meaningful in that it recognizes the right to "present any information in mitigation of punishment."

**3.** For an analysis of the amendment, see Mr. Justice Reed's summary in Andres v. United States, 333 U.S. 740 at 747, n. 11, 68 S.Ct. 880 at 883, 92 L.Ed. 1055.

**4.** "Justice Benjamin N. Cardozo, our paragon of moral ideals on the bench, said, a generation ago:

"'I have faith * * * that a century or less from now, our descendants will look back upon the penal system of today with the same surprise and horror that fill our own minds when we are told that only about a century ago 160 crimes were visited under English law with the punishment of death, and that in 1801 a child of 13 was hanged at Tyburn for the larceny of a spoon. Dark chapters are these in the history of law. We think of them with a shudder, and say to ourselves that we have risen to heights of mercy and of reason far removed from such enormities. The future may judge us less leniently than we choose to judge ourselves.'" Cahn, Confronting Injustice, at p. 308 (Little, Brown & Co. 1966).

equality should go unobserved without discordant voices being sounded. The weighted degree of proof or persuasion required under criminal insanity laws (and the judicial uncertainty of it all [5]) as to guilt or innocence cannot, in my opinion, present the same balancing factors as in determination of whether the defendant's punishment should be life or death. It is my fervent hope that the newly appointed National Commission to study our federal criminal procedures and laws will review this obvious omission and appropriate legislation will provide the remedy.

I suggest without reservation that this might be an appropriate case for consideration by the Executive of the exercise of clemency power to the extent of reducing the death sentences on the last three counts to life imprisonment. See Biddle v. Perovich, 274 U.S. 480, 487, 47 S.Ct. 664, 71 L.Ed. 1161. The ends of criminal justice would be served by a life sentence for Duane Pope. I fully recognize that clemency is not within the power of the judiciary, yet the overall circumstance of this case and need of humaneness in laws of criminal procedure require me to speak.

5. See the rules in the various circuits, Appendix, supra. See also: Overholser, Criminal Responsibility: A Psychiatrist's Viewpoint, 48 A.B.A.J. 527; Weintraub, Criminal Responsibility: Psychiatry Alone Cannot Determine It, 49 A.B.A.J. 1075; Bernstein, Criminal Responsibility: The Bar Must Lead In Law Reform, 50 A.B.A.J. 341; Diamond, From M'Naghten To Currens, And Beyond, 50 Cal.L.Rev. 189; Kuh, Insanity Defense— An Effort To Combine Law And Reason, 1102 Pa.L.Rev. 771; Ronee, McNaughten, Durham And Psychiatry, 34 F.R.D. 93; Mueller, M'Naghten Remains Irreplaceable: Recent Events In The Law Of Incapacity, 50 Geo.L.J. 105; Fingarett, Concept of Mental Disease In Criminal Law Insanity Tests, 332 Chi.L.Rev. 229; Halleck, Critique Of Current Psychiatric Roles In The Legal Process, 1966 Wis. L.Rev. 379; Lawrence, Sanity: The Psychiatric—Legal Communicative Gap, 27 Ohio S.L.J. 219; Campbell, Strict Accountability Approach To Criminal Responsibility, 29 Fed.Prob. 33; Insanity As A Defense: A Panel Discussion (Lumbard, Hays, Weintraub, Biggs, Wechster, Kolb), 37 F.R.D. 365; Moore, M'Naughten is Dead—Or Is It?, 3 Houston L.Rev. 58; Raab, Moralist Looks At The Durham And M'Naghten Rules, 46 Minn.L. Rev. 327; Ehrenzweig, Psychoanalysis Of The Insanity Plea—Clues To The Problems Of Criminal Responsibility And Insanity In The Death Cell, 73 Yale L.J. 425; Bazelon, Concept Of Responsibility, 53 Geo. L.J. 5; Falk, Sociological Approach To The "Right-Wrong" Test In Criminal Procedure, 7 Crim.L.Q. 331; Platt & Diamond, Origins Of The "Right-Wrong" Test Of Criminal Responsibility And Its Subsequent Development In The United States: An Historical Survey, 54 Cal.L.Rev. 1227; Krash, Durham Rule and Judicial Administration Of The Insanity Defense In the District of Columbia, 70 Yale L.J. 905; Cohen, *M'Naghten v. Durham*: A Discussion Of the Legal Test Of Insanity As Adopted By The Federal Courts, 3 J.A.G. Bull. 36; Board, Operational Criteria For Determining Criminal Responsibility, 61 Col.L.Rev. 221; Gibbens, Sane And Insane Homicide, 49 J.Crim.L. 110; Goldstein & Katz, Abolish The "Insanity Defense"—Why Not? 72 Yale 853; Remington & Helstad, Mental Element In Crime—A Legislative Problem, 1952 Wis.L.Rev. 644; Cavanagh, Psychiatrist Looks At The Durham Decision, 5 Cath.U.L.Rev. 25; Walton & Doherty, Psychopath And The McNaghten Rules, 1954 Crim.L.Rev 22; Morris, "Wrong" In The M'Naughten Rules, 16 Mod.L.Rev. 435; Douglas, Durham Rule: A Meeting Ground For Lawyers And Psychiatrists, 41 Ia.L.Rev. 485; Sobeloff, Insanity And The Criminal Law: From McNaghten To Durham, And Beyond, 41 A.B.A.J. 793; Bennett, Insanity Defense—A Perplexing Problem Of Criminal Justice, 16 La.L.Rev. 484; Gotlieb, Intention, And Knowing The Nature And Quality Of An Act, 19 Mod.L.Rev. 270; Hall, Mental Disease And Criminal Responsibility—M'Naghten Versus Durham And The American Law Institutes Tentative Draft, 33 Ind.L.J. 212; Hall, Psychiatry And Criminal Responsibility, 65 Yale L.J. 761; Hall, Responsibility And Law: In Defense Of The McNaghten Rules, 42 A.B.A.J. 917; Snyder, Who Is Wrong About The M'Naghten Rule And Who Cares?, 23 Brooklyn L.Rev. 1; Cohen, Criminal Responsibility And The Knowledge Of Right And Wrong, 142 Miami L.Rev. 30.