## UNITED STATES v. SONNENBERG et al.
### Nos. 9149, 9150.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 19, 1946.

Decided Dec. 18, 1946.

912

Thomas D. McBride, of Philadelphia, Pa. (Samuel P. Orlando, of Camden, N. J., on the brief), for appellants.

Grover C. Richman, Jr., Asst. U. S. Atty., of Camden, N. J. (Edgar H. Rossbach, of Newark, N. J., U. S. Atty., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN, and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

The defendants, who are husband and wife, were convicted in the District Court for the District of New Jersey, of the crime of forgery as described in Section 29 of the Criminal Code of the United States, under the Section headed "Making, forging, counterfeiting, or altering deeds or powers of attorney; transmitting such papers." 18 U.S.C.A. § 73. Alleging that the evidence produced against them, taken in the most favorable light for the prosecution, does not warrant their conviction, they appeal to this Court and ask for judgment of acquittal as provided for in Federal Rules of Criminal Procedure for the District Courts of the United States, Rule 29, 18 U.S.C.A. following section 687.

The facts which present the legal problem involved are as follows: The defendants owned and operated a drug store in Camden, New Jersey. They paid to holders of Series E War Savings Bonds, which the holders had not kept for the sixty day period prior to the time they could be redeemed, amounts less than the redemption value. At the time defendants advanced the money the then holder of the bond made manual delivery thereof to the defendants and signed his name upon the attached "Request for Payment" form. The defendants then added their own business address underneath the name of the payee. They held the bonds until the sixty day period had expired and then presented them through the Federal Reserve Bank for redemption. The large number of bonds coming into the Federal Reserve for redemption and bearing the defendants' address caused the officers in that institution to direct that the checks to the various payees, for the redemption figure, be held in the Camden Post Office and a notice sent to the payees requiring a

personal call and signed receipt before delivery of the envelopes containing the checks would be made. In the cases here involved one of the defendants, Joseph Sonnenberg, took three payees with him to the Post Office in Camden. The payee then stepped to the window, asked for the letter being held for him, received it, signed the pink receipt slip and gave it back to the Post Office employee. He immediately, in each instance, then handed the window envelope containing the check, unopened, to the defendant and received from the defendant $1.00 "for his trouble". The defendant then endorsed the name of the payee on the back of the check and deposited it in his bank for collection in the regular way.

It clearly appears from the testimony of the Government witnesses, who were the payees in the bonds involved in the transactions, that they intended the sale of those bonds to the defendants at the time the money was first paid by the defendants to them. In no case was there any statement in express words on the part of the payees giving either of the defendants authorization to sign the payees' names on the back of the checks. One other fact, however, in connection with this endorsement should be mentioned. At the time of the purchase of the bond by the defendants, the defendant, Lena Sonnenberg, procured from each of the sellers his name and address written by him upon a slip of paper. Over this signature she subsequently wrote in the words: "I give Mrs. Sonnenberg permission to sign my check received for bond # [stating the exact number for each specific bond]." Stripped of the inevitable decorative verbiage which accompanies every attempt to develop a story from witnesses not gifted with the ability of precise articulation the above statement comprises the sum total of the relevant facts.

Does the above set of facts make a case on which the defendants may be convicted for violation of Section 29 of the Criminal Code? The portion of that Section relevant to the question can be stated as follows: "Whoever shall * * * forge * * * or willingly aid, or assist in the * * * forging * * * [of] any * * * order, * * * or other writing, for the purpose of obtaining or receiving * * * from the United States, * * * any sum of money; * * * shall be fined not more than $1,000 and imprisoned not more than ten years." [1] The Supreme Court has said that this language announcing a statutory forgery imports an intent to defraud the United States.[2] The indictment in this case charges a forgery with intent to defraud the United States by the act of the defendant, Joseph Sonnenberg, in writing the name of the payee on the back of the checks received from the various payees in the instances described above "without the express authority and consent of the said payee."

To this the defendants make two answers. One of them is the fact that au-

---

[1] "Whoever shall falsely make, alter, forge, or counterfeit, or cause or procure to be falsely made, altered, forged, or counterfeited, or willingly aid, or assist in the false, making, altering, forging, or counterfeiting, any deed, power of attorney, order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving, or of enabling any other person, either directly or indirectly, to obtain or receive from the United States, or any of their officers or agents, any sum of money; or whoever shall utter or publish as true, or cause to be uttered or published as true, any such false, forged, altered, or counterfeited deed, power of attorney, order, certificate, receipt, contract, or other writing, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited; or whoever shall transmit to, or present at, or cause or procure to be transmitted to, or presented at, any office or officer of the Government of the United States, any deed, power of attorney, order, certificate, receipt, contract, or other writing, in support of, or in relation to, any account or claim, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited, shall be fined not more than $1,000 and imprisoned not more than ten years." 35 Stat. 1094, Act March 4, 1909, 18 U.S.C.A. § 73.

[2] Prussian v. United States, 1931, 282 U.S. 675, at 680, 51 S.Ct. 223, 75 L.Ed. 610. Thus an indictment is sufficient if the charge is made in the language of the statute, without expressly stating an intent to defraud.

thority was given in express words when Lena Sonnenberg filled in the authorization described above on the sheets of paper containing the signatures of the payees after the latter gave Mrs. Sonnenberg the sheets with their respective names and addresses written upon them. We think that this argument is not well taken. It is true that by the terms of the Negotiable Instruments Law, which is in force in every State in this country, a holder of an incomplete negotiable instrument has authority prima facie to fill up the blanks.[3] But that authority is only prima facie authority even in case of a document which purports to be a negotiable instrument. Furthermore, the rule does not apply to one who simply puts his name on a blank sheet of paper. In such an instance there is no presumption that the parties have anything to do with negotiable instruments, authorization to fill up blanks, or anything of the kind. It is quite clear that if one without authority writes in a negotiable instrument over another's signature on a blank sheet of paper that the one whose name appears is not bound thereby even if the document should get into the hands of a bona fide purchaser.[4] There is nothing here in the evidence to show that any actual authorization was given. On the contrary these payees testified that Mrs. Sonnenberg requested their names and addresses for the mere purpose of identification and location if necessary. We do not find, therefore, in the papers filled in by Mrs. Sonnenberg the necessary authority for the Sonnenbergs, or either of them, to endorse the Government checks issued to the payees of the bonds.

But authority to do an act for another which will bind that other does not necessarily come from express words on the part of the person to be bound. Authorization may come as a necessary implication from the facts. The defendants argue here that they did have this authority from the facts of the transactions relating to the sale of the bonds and to the subsequent manual delivery of the checks issued in payment therefor to the defendant, Joseph Sonnenberg. This argument has substance. As already stated, the evidence is undisputed that these bondholders made an unconditional sale to the defendants of whatever rights they had in the bonds. It is true that the bonds were not negotiable. But the fact of their non-negotiability does not preclude the existence of the power of the owner to transfer the beneficial interest in them to someone else. This the owners did when they manually delivered them to the Sonnenbergs for the agreed purchase price and signed their names on the application for redemption. But the facts from which the defendants' authority may be found do not stop there. In the instances which the prosecution complains of, the checks were actually passed over in their window envelopes to Joseph Sonnenberg.

The defendants have cited to us the well known Section of the Negotiable Instruments Law dealing with the right of one to whom a negotiable instrument payable to the order of the holder is transferred without endorsement to procure endorsement thereof from the transferor.[5] We think that this tends to cast the transaction into more legalistic terms than it is fair to do with the type of persons these payees quite obviously were. They were not thinking in terms of express authority, implied authority, endorser's liability, or transfers without

---

3 Negotiable Instruments Law § 14, N. J.S.A. 7:2–14. "Where the instrument is wanting in any material particular, the person in possession thereof has a prima facie authority to complete it by filling up the blanks therein; * * *".

4 Britton, Bills and Notes (1943) 323. "Where the signature is on a blank paper, so far incomplete that it is not an instrument [i. e., negotiable], Sec. 14 is perfectly clear that the defense of non-delivery of such a writing is a real defense because Sec. 14 provides that delivery of such a writing by the signer thereof for the purpose of converting it into a negotiable instrument is a condition precedent to the privilege or power of the possessor to complete it by writing a negotiable instrument above the signature."

5 Negotiable Instruments Law § 49, N.J. S.A. 7:2–49. "Where the holder of an instrument payable to his order transfers it for value without indorsing it, the transfer vests in the transferee such title as the transferor had therein, and the transferee acquires, in addition, the right to have the indorsement of the transferor; * * *".

endorsements. One of them said about Mrs. Sonnenberg: "Yes, after all she cashed it—got the bonds cashed, of course it had to go to her." He also said, in answer to a question whether he intended that Mrs. Sonnenberg should get the money: "Well, to that I'll say the best I can: If I say to you, 'I have got a quarter in my pocket,' and I give you the quarter and walk out, you got that quarter." This is far from the language of a negotiable instruments statute, but the witness made his meaning perfectly clear. Another one of the payees involved in answer to the question: "So that you knew he was getting the check and was going to get the money for it?" said: "That's right, that's what I figured." And then he was asked: "That was perfectly satisfactory to you?" The witness said: "It was." The third one was asked: "And did you know he was to get the contents of that envelope?" His answer was: "I suppose he was." The colloquy went on: "Were you agreeable that he have it?" Answer: "Yes." [6]

■ The evidence from these Government witnesses is the basis for only one possible conclusion. That is that these payees, in pursuance of the carrying out of the purchase and sale transaction between them and the Sonnenbergs, authorized the latter to do what was necessary to get the money out of the bonds which they had purchased.

■■ Furthermore, in order that a conviction under Section 29 be sustained, there must be found an intent to defraud the United States.[7] In accordance with this requirement the Trial Judge carefully charged the jury that it was necessary, before a verdict of guilty could be returned, "that you find an intent to defraud the United States."[8] From the testimony we are unable to find any evidence at all from which an intent to defraud the United States could be found.

Undoubtedly this practice of the defendants in buying up these small denomination bonds at an unconscionable discount rate was not the kind of practice to commend itself to the citizens who served on the jury. Nor was it the kind of thing which helped in the tremendous problem involved in financing a war through the voluntary purchase of Government securities by the citizenry at large. We have considerable sympathy with the prosecuting authorities in their endeavor to find a provision in the law to stop this ill-favored industry. But we see no basis on which these defendants can be held to have committed the crime with which they are charged. We must therefore, reverse. Since the facts shown will not sustain the verdict of guilty, the defendants correctly point out that they are entitled to a judgment of acquittal under the Rules of Criminal Procedure.

The judgment of the District Court is reversed and the case remanded with directions to enter a judgment for acquittal.

---

[6] In another place this same witness gave answers to questions as follows:

"Q. This arrangement by which you would get $14.75 or $15 and the Sonnenbergs would get the $18.75 when it came from the United States Treasury Department was satisfactory to you, was it not? A. That's my understanding.

"Q. And you were satisfied to let them receive the proceeds of that bond when it came? A. That's right." Appendix to Brief for Appellants, p. 55a.

[7] Martin v. White, 10 Cir., 1931, 47 F.2d 835; White v. Levine, 10 Cir., 1930, 40 F.2d 502; Lewis v. United States, 8 Cir., 1925, 8 F.2d 849.

[8] He also did his best to guard carefully against the jury becoming confused in its indignation at the defendants' practices. He said: "Now, I know there are elements in this case which may have led you to an injudicious frame of mind because of the character of the prosecution unfolded here. Whether you approve of these things or not, does not matter. What you are to concern yourselves with is whether or not the evidence adduced before you at this trial was sufficient to satisfy you beyond a reasonable doubt that they [the defendants] are guilty not of some unpatriotic act, but of the crime charged in this indictment, and that alone. * * * I have warned you and I repeat the warning again. You must not go beyond your duty. You don't have to teach these people a lesson about improper practices. * * *." Excerpts from the Charge of the District Judge printed in the Appendix to Brief for Appellants, pp. 126a and 130a.