Fannie Mae ROSS, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18453.

United States Court of Appeals
Eighth Circuit.

March 22, 1967.

David Q. Reed, Kansas City, Mo., for appellant.

F. Russell Millin, U. S. Atty., Kansas City, Mo., and Clifford M. Spottsville, Asst. U. S. Atty., Kansas City, Mo., submitted brief for appellee.

Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.

BLACKMUN, Circuit Judge.

A 72 count indictment was returned in February 1965 against Fannie Mae Ross,

age 56 and a Negro, charging her with violations of 18 U.S.C. § 1702[1] and § 495[2] in that, with the design, intent or purpose statutorily specified, she took, forged and uttered 24 United States Treasury checks issued in the name of Emma M. Williams monthly on the 3rd day of April, 1962, through the 3rd day of March 1964, inclusive.

Counsel was appointed for Mrs. Ross. She pleaded not guilty. After a two day trial a jury convicted the defendant on all 72 counts. Judge Collinson, exercising the authority the court possesses under 18 U.S.C. § 3651 and Rule 32(e), Fed.R. Crim.P., suspended the imposition of sentence and placed the defendant on probation for two years. She appeals in forma pauperis.

There is no dispute as to the basic facts. Emma M. Williams was the defendant's mother. She was over 80 years of age and lived with the defendant. She was entitled to receive, and did receive, monthly social security checks. The defendant testified that, because of her mother's bad memory, she had "an arrangement" with her to open her mail, to endorse her mother's name on the checks and to cash them, and that this was done with her "full knowledge, approval and consent".

But Mrs. Williams died on March 1, 1962. No notice of her death was given to the social security authorities or to the government disbursing office. The defendant, however, had a son in military service who was then stationed in Korea. The Department of the Army was notified of the grandmother's death and the soldier was sent home on emergency leave to attend her funeral.

The social security checks payable to Mrs. Williams continued to come in after her death. Eventually the defendant moved and her landlady told the postman not to deliver any more mail. This led to an investigation by the Secret Service and to the discovery that Emma M. Williams had died in 1962.

Mrs. Ross took the stand and conceded that the checks received after her mother's death were issued in her mother's name and that she took, endorsed and cashed them. When asked why she did this, she testified:

"Because I assumed that they were mine. I knew I had some kind of benefits coming and I just thought that they were rightfully due me and I assumed that the government knew what they were doing. They were sending them. And for another reason, I hadn't notified them of any check, but I did have to have my son come here from Korea to the funeral."

The checks so received and cashed by Mrs. Ross in the two years following her mother's death are the subject of the indictment's 72 counts.

The defendant's landlady and the landlady's daughter both testified that Mrs. Ross moved into their place after Mrs. Williams' death; that she received her mail in a regular mail box there; and that Mrs. Ross placed her own name and that of Mrs. Williams on that box.

1. "§ 1702. Obstruction of correspondence
"Whoever takes any letter * * * out of any * * * authorized depository for mail matter * * * before it has been delivered to the person to whom it was directed, with design to obstruct the correspondence * * * or opens, secretes, embezzles, or destroys the same, shall be fined not more than $2,000 or imprisoned not more than five years, or both."

2. "§ 495. Contracts, deeds, and powers of attorney
"Whoever falsely makes, alters, forges or counterfeits any deed, power of attorney, order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving * * * from the United States * * * any sum of money; or
"Whoever utters or publishes as true any such false, forged, altered, or counterfeited writing, with intent to defraud the United States, knowing the same to be false, altered, forged or counterfeited; * * *
"Shall be fined not more than $1,000 or imprisoned not more than ten years, or both."

The defense brief states:

"Appellant cashed the overwhelming majority of the checks at the same places of business where she cashed her pay checks, where she was well known and usually traded, and where it was well known that she was not Emma Williams. She did not, of course, represent to them that the checks had been endorsed by Emma Williams. Most of the witnesses who accepted the checks testified that there was no inquiry by them as to whether or not Emma Williams was dead, and that Mrs. Ross did not volunteer the fact that she was dead. The rest of the witnesses had no specific recollection of the incident. Sometimes she endorsed Emma Williams' name in the presence of the person accepting the check, and sometimes not. All of the witnesses stated they would not have accepted the checks had they known that Emma Williams was dead" [transcript references omitted].

Most of the checks were promptly cashed at a Milgram Food Store, where the defendant was a regular customer, or at Palace Liquors, where she was known by the management. One was cashed at a pharmacy; the pharmacist there testified that the defendant at the time said her name was Williams. Two other checks were cashed at a Sears Roebuck store; as to one of these the cashier testified that she assumed the presenter showed her social security card and, in answer to a question whether she knew the presenter was the payee Emma M. Williams, that "I would assume her to be and I think she represented herself as such or I would not have cashed the check, because we do not cash them on second endorsements".

During the investigation a secret service agent and an aide called on the defendant at her home. She freely answered questions and on February 2, 1965, signed a written statement.[3] This statement was introduced in evidence without objection by the defense. No claim as to its evidentiary impropriety is asserted on this appeal.

3. "My name is Fanne Mae Washington or Ross. I am 56 years of age, and my home address is 2723 Benton Blvd., Kansas City, Mo. I have been questioned by Special Agent Donald D. Bell, U. S. Secret Service, regarding twenty four (24) U. S. Treasury checks dated the third of each month from April 3, 1962 to March 3, 1964, all payable to Emma M. Williams in the amount of $42.00 each for Social Security.

"I have been advised that under the Constitution of the United States, I do not have to make any statement and that any statement I make may be used as evidence in Court in this case. I have also been advised that I have the right to talk with an attorney before I make any statement. I make this statement voluntarily and of my own free will and accord, and without having received any threats or promises. I want to tell the truth about this matter.

"Emma M. Williams was my mother, and she died March 1, 1962. I have lived with her at 2709 E. 35th Terrace, Kansas City, Mo., and because of her condition, I cashed her Social Security checks each month when they were received.

"After my mother died, I paid her funeral expenses which were almost $600.00, but I do not remember the exact amount. I did not inform the Social Security Administration that my mother had died, and I continued to received Social Security checks payable to her about the third of each month.

"I endorsed my mother's name to these checks and cashed them each month at various places in Kansas City. I cashed eleven (11) of the checks at the Palace Liquors, 2900 E. 27th St., Kansas City, Mo. I used the money from the check for my personal expenses, and I cashed the check to recover money I spent for her funeral expenses.

"After a friend told me I might get into trouble for cashing these checks, I had my landlady at 2317 Benton Blvd. return a check, and I have not received any since then. I have never contacted the Social Security Administration or any other government office to tell them my mother had died, or that I had cashed the checks.

"I have read this statement of (2) two pages and have had a chance to correct it.

"This statement is true and correct to the best of my knowledge and memory."

There is testimony about the bill for Mrs. Williams' funeral. The funeral director testified that the defendant had made the funeral arrangements; that part of the cost was covered by insurance; that the balance was to be paid at $10 a month; and that no payments beyond the insurance had been received. The landlady testified that "I asked her how she was getting those checks because it might have been wrong and I didn't want to get myself involved in it", and that Mrs. Ross told her that "her mother had it fixed so she would get" the checks and that she had to take the social security checks up to the funeral home to cash them. The landlady's daughter testified that when she asked "How was she getting the checks", the defendant also told her that "her mother had made arrangements for her to get them" and that "when the checks first started coming to my house she said she had to take them to the funeral home, and I took it for granted she was paying on her mother's funeral". On cross-examination the defendant said that she told the landlady and her daughter that she owed the funeral bill but denied that she told them she was going up to the funeral home. She conceded that she signed the statement taken by the agent but said that she was ill and "in bed sick" at the time and did not remember the sentence about her paying the funeral expenses.

There was evidence as to the defendant's good character. There was no evidence that she had been in difficulty with the law before.

■ We may accept the government's arguments that Missouri law controls any agency issue here, Still v. Union Circulation Co., 101 F.2d 11, 12 (2 Cir. 1939), cert. denied 308 U.S. 565, 60 S.Ct. 78, 84 L.Ed. 474, and that under the law of Missouri Mrs. Williams' death terminated any agency status which the defendant theretofore possessed to open, endorse and cash her mother's social security checks. Long v. Thayer, 150 U.S. 520, 522, 14 S.Ct. 189, 37 L.Ed. 1167 (1893); Holliday v. Clark, 110 S.W.2d 1110, 1111 (Mo.1937); Ridenour v. Duncan, 246 S.W.2d 765, 770 (Mo.1952).

■ And we may accept the defense argument that specific fraudulent intent is an essential element for convictions under 18 U.S.C. § 1702 and § 495. This is evident from the "with design to obstruct the correspondence" language of § 1702 and from the phrases "for the purpose of obtaining or receiving" and "with intent to defraud" in § 495. Walker v. United States, 342 F.2d 22, 26–27 (5 Cir. 1965), cert. denied 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed.2d 97; Leonard v. United States, 324 F.2d 911, 913 (9 Cir. 1963); United States v. Sonnenberg, 158 F.2d 911, 915 (3 Cir. 1946); United States v. Grieco, 25 F.R.D. 58, 60 (S.D.N.Y.1960). See Gilbert v. United States, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962).

Beyond this, the defense raises six points:

1. The sufficiency of the evidence on the issue of specific fraudulent intent. The defense argues that Mrs. Ross merely continued, after her mother's death, a course of conduct which theretofore was lawful; that the defendant had heard of a social security death benefit and knew she had benefits coming; that the checks did arrive and were honored; that the government was notified of Mrs. Williams' death and even acted on that information when it sent the defendant's son home from Korea; that most of the checks were cashed in the defendant's neighborhood and at places where she was well known; that there was no attempt to conceal anything; that she freely admitted the cashing of the checks to the investigating officers; and that her prior record was unblemished. All this, says the defense, "Squarely points to an innocent mistake".

■ This is good argumentative material for the jury. The issue of intent, however, is an issue of fact and we are compelled to hold that on the entire record there is sufficient evidence to support the conviction. The defendant, of course, knew of her mother's death. There is competent evidence here

that thereafter the defendant endorsed the checks with her deceased's mother's name and with no representative or agency description; that she did not notify Social Security of the death; that she did not reveal the death to anyone to whom she presented the checks; that at her new abode, to which she moved after her mother's death, she placed Mrs. Williams' name on the mail box; that her right to receive the checks was questioned both by the landlady and by the landlady's daughter; that the defendant replied that she was taking the checks to the funeral home; and that on at least one occasion, and perhaps two, the defendant did represent herself as the payee. In addition, there are obvious discrepancies between the defendant's testimony, and even the statement she signed, and the testimony of other witnesses.

The notification to the Department of the Army was, we feel, just one factor bearing upon intent. It certainly is not conclusive in the present context.

2. The forging and uttering counts under § 495. The defense argues that these counts must fall because the defendant began to endorse checks under a valid agency arrangement; that she continued to endorse them as her mother's agent; that she did not represent that the endorsements were by her mother; and that, even if fraudulent intent is present, a false agency endorsement cannot constitute forgery. Gilbert v. United States, supra, 370 U.S. 650, 82 S.Ct. 1399, is cited.

But *Gilbert* concerned a "trustee" endorsement. The court held p. 657, 82 S. Ct. p. 1404, that the word "forge" in § 495 "should not be taken to include an agency endorsement", but remanded the case for a new trial because, p. 659, 82 S.Ct. p. 1404, "we are not prepared at this stage to say that the Government might not be entitled to succeed * * * upon the theory that petitioner never signed the Bartfields' names in a representative capacity". Three Justices (out of 7) dissented, p. 659, 82 S.Ct. p. 1404, "believing that one who endorses a check in the name of the payee without authority to do so is guilty of forgery under 18 U.S.C. § 495, whether or not the forger falsely purports to have signed the payee's name as an authorized agent".

Section 495 (in contrast, for example, to 18 U.S.C. § 471, § 472, and § 2314), with its reference to "other writing", has been held to have application to a forged endorsement. Prussian v. United States, 282 U.S. 675, 679–680, 51 S.Ct. 223, 75 L.Ed. 610 (1931); United States v. Henderson, 298 F.2d 522, 526 (7 Cir. 1962), cert. denied 369 U.S. 878, 82 S.Ct. 1150, 8 L.Ed.2d 280; Roberts v. United States, 331 F.2d 502, 505 (9 Cir. 1964). Compare Streett v. United States, 331 F. 2d 151 (8 Cir. 1964), and Hall v. United States, 372 F.2d 603 (8 Cir. 1967), relating to 18 U.S.C. § 2314, and Roberts v. United States, supra, p. 505 of 331 F.2d (count two), and Webster v. United States, 59 F.2d 583, 585–586 (8 Cir. 1932), cert. denied 287 U.S. 629, 53 S.Ct. 81, 77 L.Ed. 545, relating to § 472.

Mrs. Ross, however, endorsed the checks in her mother's name, knowing her mother to be deceased, and she did so without embellishment by way of agency or other qualifying designation. This fact contrasts with the trustee appellation employed in Gilbert v. United States. As a consequence, the actual holding of the bare majority in that case has no application here. It was the view of all seven participating Justices that forgery, under § 495, does embrace a false and fraudulent making. The Justices differed only as to an agency endorsement. Here we are concerned with the genuineness of execution, and not with mere misstated capacity or falsity of content. United States v. Wilkins, 328 F.2d 120, 121 (2 Cir. 1964), affirming 213 F.Supp. 332 (S.D.N.Y.1963). See Selvidge v. United States, 290 F.2d 894, 895 (10 Cir. 1961).

The defense cites Parker v. United States, 297 F.2d 135 (5 Cir. 1961). That, however, is a case having what the court described, p. 137, footnote 4, as "an unusual record" and "a unique defense"; its record contained nothing which gave

the defendant reason to believe that the purported drawer would treat the check as unauthorized. In the present case absence of authority after Mrs. Williams' death is positive and automatic.

█ We hold that Mrs. Ross forged these checks, within the meaning of § 495, and that her attack upon the forging and uttering counts must therefore fail.

3. The obstruction counts under § 1702. The argument here is that Mrs. Williams was the addressee on the checks and, because she then was deceased, there could be no obstruction of correspondence and no violation of § 1702. United States v. Grieco, 187 F.Supp. 597 (S.D.N.Y. 1960), is cited.

In *Grieco*, the addressee was a fictitious person. The letter in question, containing marked money, was used as a decoy in an attempt to discover the source of pilfering of mail addressed to residents at a New York City hotel. The letter was delivered to the hotel in due course but was thereafter missing from the place it had been left. The marked money was found in the defendant bellhop's possession. The district court held that, because the addressee was a fictitious person, the crime charged by § 1702 was impossible of commission, regardless of the intent of the accused. It said that the statute is concerned with unauthorized meddling with the mails, as contrasted with 18 U.S.C. §§ 1703 and 1708, which are directed to delay, destruction or theft of mail. See United States v. Logwood, 360 F.2d 905, 908 (7 Cir. 1966), and United States v. Wade, 364 F.2d 931, 934 (6 Cir. 1966).

█ We need not decide whether we agree or disagree with the holding in United States v. Grieco. One of course may argue that there is some analogy between a fictitious addressee and a deceased one. We think, however, that there is a difference. A person recently deceased is one who recently was living and was not fictitious and, in this case, Mrs. Williams was one who, so far as the Social Security Administration and the disbursing office had reason to know, was still living. Further, there were secondary addressees here. One, which comes into being by operation of law, is the representative of the decedent's estate. Another is the disbursing office itself. We may take judicial notice that a social security check is sent out by first class mail and bears on its envelope not only a return address but a written direction that if the addressee is deceased it is to be returned to the sender. Thus, even under the defense theory and the rationale of the *Grieco* case, an addressee, albeit a secondary one, was in existence. Accordingly, there was an obstruction of correspondence, within the meaning and reach of § 1702, when the defendant intercepted the social security checks.

This court has said that the plain language of § 1702 "discloses a clear intent on the part of Congress to extend federal protection over mail matter from the time it enters the mails until it reaches the addressee or his authorized agent". Maxwell v. United States, 235 F.2d 930, 932 (8 Cir. 1956), cert. denied 352 U.S. 943, 77 S.Ct. 266, 1 L.Ed.2d 239. We would be reluctant to retreat from that broad approach and now to construe § 1702 narrowly so as to defeat this congressional purpose and enable an accused to avoid responsibility on the technical argument that interference with social security mail addressed to a person recently deceased, but whose death is unknown to the disbursing office, and which mail bears a return address and return instructions, is incapable of delivery and cannot be obstructed.

The attack on the obstruction counts therefore fails.

█ 4. The denial of the motion for a bill of particulars. This pretrial motion was detailed and lengthy. It would serve no useful purpose for us fully to outline its contents here. We bear in mind that this court has said that the acquisition of evidentiary detail is not the function of a bill of particulars; that the motion is generally addressed to the sound discretion of the trial court; and that that court's ruling will not be disturbed except for clear abuse of discretion. Kansas City Star Co. v. United

States, 240 F.2d 643, 650 (8 Cir. 1957), cert. denied 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438. In the same case we held that a bill will not be required if the language of the indictment is definite and certain enough as to safeguard the defendant's rights and to enable him properly to prepare his defense.

█ Although the present indictment contained 72 counts, the situation was not a complex one. The counts focus on the receipt and disposition of the successive monthly social security checks all issued in one name. The defendant knew what these checks were, how and where she had cashed them, and what was at issue. As we have noted above, the defense even argues that "the overwhelming majority of the checks" were cashed in her neighborhood and where she was well known, specifically, at the Milgram store and at Palace Liquors. We hold that the indictment met the "plain, concise and definite" standard prescribed by Rule 7(c), Fed.R.Crim.P.; that the defendant was not prejudiced in her trial preparation; that there was no surprise; and that the denial of the motion for a bill of particulars was in no way an abuse of the trial court's discretion.

5. The voir dire. The defense complains that the district court also abused its discretion in refusing requests for four specific questions upon voir dire. The first was an inquiry as to prejudice against persons employed as domestic servants. It is said that this question was vital because there were Negroes on the panel and "it is a well known fact * * * that there are many negroes with strong feelings of hostility and contempt for those of their fellows who are willing to work as domestic servants in the homes of white people", and because it consequently became necessary for the defense to use its strikes to remove all Negroes from the jury. The second was whether the juror believed "that the testimony of any government investigator is entitled to more weight than the testimony of any other witnesses". The third was whether the juror or any member of his immediate family was receiving social security payments or other government checks through the mail. The fourth was whether any close friend worked in any capacity for any law enforcement organization (the court did inquire as to whether the juror or any member of his immediate family worked in such capacity).

The defense cites no supporting authority.

█ As authorized by Rule 24(a), Fed.R.Crim.P., the court itself conducted the voir dire examination. When the court does this, it has "a broad discretion as to the questions to be asked". Aldridge v. United States, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); Connors v. United States, 158 U.S. 408, 413, 15 S.Ct. 951, 39 L.Ed. 1033 (1895). The Aldridge case tells us, however, that the exercise of this discretion is "subject to the essential demands of fairness". The issue thus comes down to the question whether there was an abuse of discretion. Stephan v. Marlin Firearms Co., 353 F.2d 819, 822 (2 Cir. 1965), cert. denied 384 U.S. 959, 86 S.Ct. 1584, 16 L.Ed.2d 672. Rule 24(a) contemplates no more. See, generally, Pope v. United States, 372 F.2d 710, 726 (8 Cir. 1967); Kiernan v. Van Schaik, 347 F.2d 775, 778 (3 Cir. 1965); United States v. Napoleone, 349 F.2d 350, 353 (3 Cir. 1965); Maguire v. United States, 358 F.2d 442, 444–445 (10 Cir. 1966), petition for certiorari dismissed, 385 U.S. 801, 87 S.Ct. 9, 17 L.E.2d 48.

█ We see no abuse of discretion here. We are not prepared to accept the defense's suggestion that Negroes on the panel will fail to fulfill their public duty as fair and impartial talesmen because of ingrained prejudice against others of their race who are engaged in domestic work for white persons. Further, the court made a comprehensive examination of the panel. It asked whether any member or "any close relatives, by that I mean people who live in your home or relatives whom you see often" were engaged in law enforcement. It asked whether anyone had had a check or other security stolen and forged and cashed, or whether anyone had been in the position

where he had paid out money for a forged check or other security, and it asked whether anyone on the panel would be prejudiced against the defendant because she was a Negro. These questions, coupled with other inquiries by the court, demonstrated a pertinent depth of inquiry and, we feel, met "the essential demands of fairness".

Perhaps, however, an additional comment should be made with respect to the particular question about giving the testimony of any government investigator more weight than the testimony of other witnesses. The appropriateness of such an inquiry directed to a law enforcement officer "simply because of his official character" is indicated by dictum in Chavez v. United States, 258 F.2d 816, 819 (10 Cir. 1958), cert. denied 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577. Later, the District of Columbia Circuit, over a dissent and then a reluctant acquiescence, held that a refusal to give the instruction is reversible error where the testimony from law enforcement officers is "virtually the entire case for the prosecution". Sellers v. United States, 106 U.S.App.D.C. 209, 271 F.2d 475 (1959); Brown v. United States, 119 U.S.App. D.C. 203, 338 F.2d 543, 544–545 (1964). In the latter case, however, the principal opinion observed, p. 545, that "Failure to make appropriate inquiry, when requested, does not necessarily require reversal", and that "the issue turns on the degree of impact which the testimony in question would be likely to have had on the jury and what part such testimony played in the case as a whole". The First Circuit, in Gorin v. United States, 313 F.2d 641, 647 (1 Cir. 1963), cert. denied 374 U.S. 829, 83 S.Ct. 1870, 10 L.E.2d 1052, held that the failure to ask this question along with others did not amount to an abuse of discretion because the court's "general questions coupled with its charge afforded the appellants ample protection".

In the present case only one investigating officer appeared as a witness. There were 13 other witnesses for the prosecution. The officer sat at the counsel table with the government attorneys. He was the agent who took the defendant's statement which was introduced without objection from the defense. His testimony was concerned mainly with that statement. The prosecution, in its argument to the jury, made no reference to this agent-witness. While the court might properly have made the inquiry, we find, under these circumstances, no prejudice in its failure to make it. It is apparent, we think, that even under the more rigid District of Columbia approach the failure, on this record, would not be held to be reversible error.

6. Government's Exhibit 32. This was a part of the business records of the funeral home and seemingly was offered to show that the defendant, despite suggestions to the contrary from other sources, had made no payment on her mother's funeral bill. The defense objected to the exhibit as irrelevant and immaterial. The defense repeats here its charge of irrelevancy and asserts that what the defendant did with the proceeds of the social security checks was immaterial; that the exhibit was prejudicial; and that government counsel built his argument to the jury around the funeral bill and its incomplete payment. The defense also charges that if the exhibit is defended because it is said that it bears on the credibility of the defendant (who had not yet testified, although her written statement was in evidence), its use was improper collateral impeachment.

We agree that the exhibit could properly have been ruled inadmissible and that its use amounted to improper collateral impeachment. See Lennon v. United States, 20 F.2d 490, 494 (8 Cir. 1927); Homan v. United States, 279 F. 2d 767, 771 (8 Cir. 1960), cert. denied 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88;

106

Curtis Publishing Co. v. Butts, 351 F.2d 702, 715 (5 Cir. 1965), affirming, on this point, 225 F.Supp. 916, 921 (N.D.Ga. 1964), cert. granted 385 U.S. 811, 87 S.Ct. 30, 17 L.Ed.2d 52.

Judge Collinson, however, became fully cognizant of the developing situation. In his charge to the jury he observed that without objection "both lawyers were asking questions about the funeral bill, how much was paid, and so forth". He said flatly "I don't think this testimony was material in any way in this case". He instructed that "the fact that she did not use the money to pay the funeral bill is no evidence whatsoever of an intent to defraud. * * * So that should not be considered by you in any way, the fact there was something owed on the funeral bill, on the question of whether or not this defendant did these various acts with the intent to defraud".

We have recently observed that curative instructions usually leave a reviewing court mildly uncomfortable. Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679, 684 (8 Cir. 1966). We are satisfied, however, after a review of the entire record, that the district court's evaluation of the situation was valid and appropriate, that the prosecution did not build its summation around the funeral bill, and that the jury's disregard of the instructions is not to be assumed. The fact situation here was simple and the jury was fully aware of all that had taken place. We are convinced that the jury was not led astray or unduly influenced by the references to the funeral bill.

We thus affirm the judgment of conviction. It is unfortunate, of course, that this defendant, who apparently has no prior blemish on her legal record, finds herself convicted of felonious activity. But we cannot say that the record does not support the jury's determination that what she did was violative of § 495 and of § 1702.

Affirmed.